[No. 37012. Department Two. October 8, 1964.]

THE STATE OF WASHINGTON, *Respondent,* v. WILLIE JAMES SULLIVAN, *Appellant.**

*Reported in 395 P. (2d) 745.

48

 

*Kadish & Kane,* by *Richard E. Kane,* for appellant.

*Charles O. Carroll* and *Mary W. Brucker,* for respondent.

FINLEY, J.—This is an appeal from a judgment imposing a maximum term of 20 years on a charge of illegal possession of narcotics.

Preceding the trial of defendant-appellant Sullivan, a motion was made to suppress certain evidence on the grounds that it was the product of an unlawful search and seizure, and not incidental to a lawful arrest. The motion was denied. The questioned evidence was admitted by the trial judge, and, ostensibly, considered by the jury. Here on appeal, error is assigned respecting the failure of the trial judge to exclude the questioned evidence.

There is no substantial dispute as to the facts. Officers Joe Kneeland and Donald Cameron, of the Seattle Police Department, were on duty in a prowler car in the Garfield High School area on the evening of April 13, 1962. They paced an automobile which was going 34 miles per hour in a 25-mile-an-hour zone and, subsequently, stopped it. Officer Kneeland, the driver of the prowler car, stepped alongside the "stopped" car on the driver's side. Officer Cameron took a position on the passenger side of the "stopped" automobile. Officer Kneeland interrogated the driver of the car (appellant-defendant Sullivan), and asked to see his driver's license. Sullivan stated that he had none. Thereupon, Officer Kneeland, following routine procedure, requested the driver to step out of the car. As the driver complied, the opening of the car door turned on a light which illuminated the front seat, as well as the front floor area of the car. At this point, Officer Cameron saw a glass, pharmaceutical ampoule on the floor adjacent to the front seat on the passenger side of the car. He reached

into the car and picked up the ampoule. His exclamation, "Methedrine!", was overheard by Officer Kneeland.

Officer Cameron requested the occupant of the passenger side of the front seat to get out of the car, and then proceeded with a search of the front seat area. He found another one-cc. glass, pharmaceutical ampoule of Methedrine. Officer Kneeland, proceeding almost simultaneously, searched the sweater pockets of appellant Sullivan and found two marijuana cigarettes. Shortly thereafter, a search of appellant Sullivan's apartment, with his consent, resulted in the discovery of a third, partially-smoked, marijuana cigarette.

In appellant's behalf, it is argued that Officer Cameron, in reaching into the car and seizing the small one-cc. ampoule of Methedrine from the floor of the car, engaged in a search and seizure which was not incident to the traffic-speeding arrest and was, therefore, unlawful. It is argued further that the subsequent search of the person of Sullivan, which produced the marijuana cigarettes, was unlawful for the same reason. Basically, appellant reasons or argues that the ampoules of Methedrine and the marijuana cigarettes actually were secured in an unlawful search and seizure, and, consequently, were inadmissible as evidence under the so-called "fruit of the poison tree" doctrine. (See: *Mapp v. Ohio* (1961), 367 U. S. 643, 6 L. Ed. (2d) 1081; *Weeks v. United States* (1913), 232 U. S. 383, 58 L. Ed. 652; *State v. Buckley* (1927), 145 Wash. 87, 258 Pac. 1030.) Both pharmaceutical ampoules, bearing the label "Methedrine" and containing one cc., each, of the drug, and the two marijuana cigarettes and a third "half-smoked" one, were admitted into evidence and are before this court as part of the record on appeal.

Each of the arresting officers testified that, at the time of the arrest, he thought "Methedrine" was either a narcotic, or was used extensively by addicts and was closely associated with the illegal trade and use of narcotics.[1] We

[1] ". . . The dangerous drugs that are most commonly used by 'thrill seekers' are in the amphetamine category. These popular drugs are commercially known by their brand names: Benzedrine, Desoxyn

are convinced that the general circumstances following the routine technical apprehension for speeding (most particularly, the sighting on the floor of the car the glass pharmaceutical ampoule, unmistakably designed to permit its liquid contents to be administered hypodermically), suggested reasonably reliable and persuasive overtones of narcotic violations to the arresting officers. Officer Cameron, having sufficient probable cause to believe narcotic violations were being committed to make an arrest, was justified in reaching into the car and picking up the first ampoule. See *State v. Brooks* (1960), 57 Wn. (2d) 422, 357 P. (2d) 735, where the sighting of bags of uncuffed pants in the rear seat of an automobile was sufficient cause to believe a felony had been or was being committed, and to justify the arrest and the search incident thereto.

The conclusion seems inescapable that no unjustified search and seizure had occurred prior to the time that Officer Kneeland was informed that an ampoule of Methedrine (a drug known to be closely associated with narcotic

or Methedrine. For legitimate medical purposes, amphetamines are often used for weight control, to counteract depression, in the treatment of alcoholism, narcolepsy, or barbituate poisoning. Amphetamines in liquid form are infrequently used by psychiatrists, and by clinics and hospitals in certain preoperative and postoperative situations.

"Among the 'thrill seekers' these amphetamines are taken intravenously in extremely large doses and in this manner they maintain a state of euphoria. Many heroin addicts claim that amphetamines are as satisfactory to their sordid desires as any heavy narcotic. According to Federal and state narcotic agents, many known addicts of heavy narcotics in this area are maintaining their habit and not suffering any of the typical withdrawal symptoms, merely by substituting amphetamines for heroin, opium, morphine or other narcotics.

" . . .

"It was discovered by the Committee that on the streets of Seattle massive quantities of these dangerous drugs, in both solid tablet and liquid form, are unlawfully available, and are being used and resold by many persons. The Seattle Police Narcotics Division estimated that there are at least 300 known users. An admitted peddler of dangerous drugs testified before your Committee that there were at least 400 known users of amphetamines among his customers. . . ." *Joint Committee on Governmental Cooperation, 1963 Washington State Legislature: Report and Recommendations—Narcotics and Dangerous Drugs in Washington*, page 42.

addiction and illegal traffic in narcotics) had been found on the floor of the car. In this connection it was not unreasonable to infer that the ampoule had been thrown to the floor in accordance with a recognized, common tendency of law violators to rid their persons of illegal, contraband articles when about to be apprehended by the police. Reasonable cause existed to believe that narcotic violations had been committed, or were in progress, and thus the probable cause to make an arrest justified the search of the person of the suspect, appellant Sullivan.

■ There is another ground upon which this conviction should be affirmed. It involves the following combination of facts and legal conclusions. First, the defendant was under technical arrest when he was stopped for the traffic violation. At this point, perhaps the search and seizure activities of the officers were restricted in terms of purpose and scope in relation to (a) the traffic violation, and (b) the safety of the officers. But, Officer Cameron then by happenstance observed what appeared to him to be contraband on the floor of defendant's car. This discovery gave rise to probable cause for the officers to believe that the defendant was committing a felony in their presence, and they then searched him, while he was still under arrest for the misdemeanor, to seize the narcotics that they strongly believed he possessed.

Perhaps it should be mentioned that as a general rule a person is placed under arrest when he is deprived of his liberty by an officer who intends to arrest him. It is not always necessary for an officer to make a formal declaration of arrest. See: 1 Varon, Searches, Seizures and Immunities 75 (1961); *Henry v. United States* (1959), 361 U. S. 98; *United States v. Boston* (1964), 330 F. (2d) 937, 939. Officer Kneeland testified that he had arrested the defendant when he turned on his red light and pulled the defendant over to the curb for the misdemeanor, *i.e.,* speeding. This conclusion is supported by the record considered as a whole.

Thus, it was after the defendant had been arrested for speeding that Officer Cameron, by happenstance, noticed

the ampoule on the floor of the car and thought he recognized it as contraband. At the trial, defense counsel asked Officer Cameron why he had asked the passenger to step out of the car. Officer Cameron answered:

"I [have] only seen an ampoule like this twice before. Both times with Methadrine. I wanted to make sure it was Methadrine. Sitting would make it difficult to pick it up, crossing over him, not very polite."

It is unlawful in the state of Washington for a person to possess Methedrine unless he has a valid prescription for it. RCW 69.40.061. Thus it seems that the doctrine or statement of *Carroll v. United States* (1925), 267 U. S. 132, 149, 39 A.L.R. 790, is pertinent, as follows:

"On reason and authority the true rule is that if the search and seizure without a warrant are made upon probable cause, that is, upon a belief, reasonably arising out of circumstances known to the seizing officer, that an automobile or other vehicle contains that which by law is subject to seizure and destruction, the search and seizure are valid. . . ."

Aside from the arrest for speeding, the officer had the right *and the duty* to seize what reasonably appeared to him to be contraband.

The fact that he was under arrest for speeding did not insulate and protect the defendant from seizure of contraband when it was observed by the officer standing outside the car in the street. We think it significant that it does not appear that the officers were looking for contraband; but when they did, by happenstance, come upon it, they were not prevented from seizing it by the fact that they had only arrested the defendant for speeding. *Harris v. United States* (1947), 331 U. S. 145, 155. Thereafter, as indicated above, upon discovering contraband, the police officers were justified in searching the defendant for other evidence of narcotic violations, as they then had probable cause to believe that a felony was being committed in their presence.

We are not convinced that the constitutional rights of the defendant and the protection he was entitled to there-

under required the officers to proceed in a different manner. In fact, if the officers had acted otherwise, this might well have been considered dereliction of duty on their part.

In *State v. Michaels* (1962), 60 Wn. (2d) 638, 374 P. (2d) 989, we held that an arrest for a traffic violation, *made as a mere pretext* for a search of an automobile for contraband, did not justify the search and necessitated judicial suppression of any evidence so obtained. The record before us in the present appeal indicates that the initial traffic arrest was nothing other than routine. The subsequent searches were instituted not according to preconceived design, but after the coincidental sighting of suspicious-looking drug ampoules within the car. The facts in the instant case do not bring it within the ambit of the decision in the *Michaels* case.

As we have concluded that the searches and the arrests were lawful, it follows that the action of the trial court was proper in denying the motion to suppress the seized evidence. The judgment of the trial court is affirmed.

OTT, C. J., WEAVER and HAMILTON, JJ., concur.

DONWORTH, J. (dissenting)—For the reasons stated below, I am of the opinion that the evidence admitted was unlawfully obtained by the police officers and that the motion to suppress should have been granted.

At the time of the search and seizure, the following facts were established. Appellant's automobile was stopped by police officers for driving at 34 miles per hour in a 25 mile per hour zone. Appellant did not have a valid driver's license and was asked to step out of the vehicle by Officer Kneeland, who testified he did not place appellant under arrest. As appellant stepped out of the vehicle, an interior light was turned on by the opening of the driver's door. As the light came on, Officer Cameron, who was standing next to the passenger's door, observed a glass ampoule on the floor of the car. He testified at the trial concerning the events as follows:

". . . I just saw an ampule on the floor. I didn't realize it was Methadrine until after I picked it up."

Further, he testified:

" . . . I have never seen that type of ampule before. Q. [By appellant's counsel] Then it might possibly be an amphetamine? A. As I said, I have never seen that type before."

Officer Cameron then opened the passenger's door and picked up the ampoule.

When Officer Cameron picked up the ampoule, he read aloud the word "Methedrine" from the label. It is this fact, the majority holds, that created the probable cause for an arrest which validated the subsequent search of appellant. In effect, the majority reasons that the officer knew that the ampoule contained Methedrine (a nonnarcotic) before any search of the vehicle occurred.

The test to be applied in such a case is stated by the United States Supreme Court in *Wong Sun v. United States,* 371 U. S. 471, 479, 9 L. Ed. (2d) 441, 83 S. Ct. 407 (1963), as follows:

" . . . It is basic that an arrest with or without a warrant must stand upon firmer ground than mere suspicion, see *Henry v. United States,* 361 U. S. 98, 101, though the arresting officer need not have in hand evidence which would suffice to convict. The quantum of information which constitutes probable cause—evidence which would 'warrant a man of reasonable caution in the belief' that a felony has been committed, *Carroll v. United States,* 267 U. S. 132, 162—must be measured by the facts of the particular case. The history of the use, and not infrequent abuse, of the power to arrest cautions that a relaxation of the fundamental requirements of probable cause would 'leave law-abiding citizens at the mercy of the officers' whim or caprice.' *Brinegar v. United States,* 338 U. S. 160, 176.

"Whether or not the requirements of reliability and particularity of the information on which an officer may act are more stringent where an arrest warrant is absent, they surely cannot be less stringent than where an arrest warrant is obtained. Otherwise, a principal incentive now existing for the procurement of arrest warrants would be destroyed. The threshold question in this case, therefore, is whether the officers could, on the information which impelled them to act, have procured a warrant for the arrest of Toy. We

think that no warrant would have issued on evidence then available."

In the same case, at page 484, the Supreme Court pointed out that it had consistently rejected the proposition that a search, unlawful at its inception, may be validated by what it turns up.

In *Ker v. California,* 374 U. S. 23, 32, 10 L. Ed. (2d) 726, 83 S. Ct. 1623 (1963), the Supreme Court, in reviewing a conviction in a state court where the issue of unreasonable search and seizure was raised, said:

"Implicit in the Fourth Amendment's protection from unreasonable searches and seizures is its recognition of individual freedom. That safeguard has been declared to be 'as of the very essence of constitutional liberty' the guaranty of which 'is as important and as imperative as are the guaranties of the other fundamental rights of the individual citizen. . . .' *Gouled v. United States,* 255 U. S. 298, 304 (1921); cf. *Powell v. Alabama,* 287 U. S. 45, 65-68 (1932). While the language of the Amendment is 'general,' it 'forbids every search that is unreasonable; it protects all, those suspected or known to be offenders as well as the innocent, and unquestionably extends to the premises where the search was made. . . .' *Go-Bart Importing Co. v. United States,* 282 U. S. 344, 357 (1931). Mr. Justice Butler there stated for the Court that '[t]he Amendment is to be liberally construed and all owe the duty of vigilance for its effective enforcement lest there shall be impairment of the rights for the protection of which it was adopted.' *Ibid.* He also recognized that '[t]here is no formula for the determination of reasonableness. Each case is to be decided on its own facts and circumstances.' *Ibid.;* see *United States v. Rabinowitz,* 339 U. S. 56, 63 (1950); *Rios v. United States,* 364 U. S. 253, 255 (1960).

"This Court's long-established recognition that standards of reasonableness under the Fourth Amendment are not susceptible of Procrustean application is carried forward when that Amendment's proscriptions are enforced against the States through the Fourteenth Amendment. And, although the standard of reasonableness is the same under the Fourth and Fourteenth Amendments, the demands of our federal system compel us to distinguish between evidence held inadmissible because of our supervisory powers

over federal courts and that held inadmissible because prohibited by the United States Constitution. We reiterate that the reasonableness of a search is in the first instance a substantive determination to be made by the trial court from the facts and circumstances of the case and in the light of the 'fundamental criteria' laid down by the Fourth Amendment and in opinions of this Court applying that Amendment. Findings of reasonableness, of course, are respected only insofar as consistent with federal constitutional guarantees. . . ."

Since its decision in *Mapp v. Ohio*, 367 U. S. 643, 6 L. Ed. (2d) 1081, 81 S. Ct. 1684, 84 A.L.R. (2d) 933 (1961), the fourth amendment to the United States Constitution and the Supreme Court's decisions construing it are binding on this court.

With these decisions in mind, I revert to the facts of the present case bearing upon the question of whether officers Cameron and Kneeland had reasonable and probable cause to arrest appellant which would allow the subsequent search.

In my opinion, a search and seizure occurred when Officer Cameron opened the passenger's door and picked up the ampoule. At that time the officers could not associate Methedrine with narcotics (thus having the probable cause for an arrest found by the majority), without first conducting a search and seizure. There is absolutely no evidence in the record to indicate that a glass ampoule was or could be associated, by the officers, with narcotics, narcotic users, or even that it could be used with a hypodermic syringe. Nor is there any evidence to support the position that the ampoule was itself contraband or that it was thought to be such by the officers. Accordingly, there is nothing illegal or suspicious in the possession of a glass ampoule based on the record before this court. Therefore, I cannot agree that there was probable cause for an arrest for a narcotic violation (or even suspicion thereof) that could validate the subsequent search of appellant.

The record is also devoid of any evidence that the officers were aware of the legislative committee's report on Methedrine quoted by the majority. The testimony indicates the

only knowledge the officers had about Methedrine was that they had mistakenly thought it was a narcotic. The mere suspicion that it might be a narcotic is not enough to create the probable cause for an arrest and validate a subsequent search and seizure.

Neither can the search be validated as being incident to a legal arrest for a traffic violation. As previously stated, Officer Kneeland, the officer who stopped the car and approached appellant, testified as follows at the trial:

"Q. What is the reason that you asked him to step out of the car? A. When I stopped the car, we have the light in on the side, and I asked Mr. Sullivan for his driver's license and he stated that he had no driver's license. Q. At that time did you put him under arrest? A. No, at that time I just asked him to step out of the car."

From this testimony, I think it is reasonable to conclude that no search could be conducted as incident to an arrest for a traffic violation, because appellant was not placed under arrest nor was the officer aware of any other fact or circumstance which would give him probable cause for an arrest.

I cannot agree that the search of appellant is valid under the rules of the previously cited cases or that it qualifies as a search without a warrant, as discussed in *Preston v. United States,* 376 U. S. 364, 11 L. Ed. (2d) 777, 84 S. Ct. 881 (1964).

*State v. Brooks,* 57 Wn. (2d) 422, 357 P. (2d) 735 (1960), cited by the majority, has no application in the present case. The presence of a glass ampoule in the automobile is not in itself evidence of contraband, nor does its possession give rise to evidence of suspicious circumstances.

I am of the opinion that the evidence obtained in the search of appellant's automobile (two ampoules of Methedrine) and of his person (two marijuana cigarettes) was the result of an illegal search and seizure. Under the rules laid down in the recent decisions of the Supreme Court cited above, appellant's motion to suppress that evidence

should have been granted by the trial court. I, therefore, dissent and would reverse appellant's conviction and grant him a new trial.

December 7, 1964. Petition for rehearing denied.

*Reported in 395 P. (2d) 758.