[No. 2289–3. Division Three. April 21, 1978.]

THE STATE OF WASHINGTON, *Respondent*, v. MARK A. LaRUE, *Appellant*.

*Stephen E. Llewellyn,* for appellant (appointed counsel for appeal).

*Arthur R. Eggers, Prosecuting Attorney,* for respondent.

GREEN, J.—Mark A. LaRue appeals a conviction for second–degree assault. He assigns error to the trial court's admission of certain statements made by him to correctional officers at the Washington State Penitentiary.

The issue on appeal is whether either the United States Constitution, WAC 275–88–035(2) or WAC 275–88–075(1) required these officers to advise Mr. LaRue of his constitutional rights in the circumstances presented.

On October 14, 1976, at approximately 12:30 p.m., a Washington State Penitentiary inmate, Daniel Conklin, was stabbed while he was in an exercise period on Tier A of the maximum security wing in the penitentiary. Conklin testified that LaRue, the only other prisoner out on exercise,

passed behind him and stabbed him in the side with an 8–to 10–inch knife. When Conklin turned, he saw LaRue who said, "You're dead." and "Get off the tier." Conklin then ran to the gate and called out for a guard. Sergeant Lewis Menke answered and had him taken to the penitentiary hospital. Menke saw LaRue on the tier hallway and ordered him into his segregation cell.

Approximately 8 to 10 minutes after the stabbing, Menke conversed with LaRue for a minute or two without first warning him of his constitutional right to remain silent. Menke testified he asked LaRue what happened to the knife, and LaRue responded that he wouldn't hand it over, wouldn't cooperate, and that he had to do it. Menke stated that while he considered LaRue to be a suspect, his purpose was to get the weapon out of the area, not to investigate the crime. All the cells on Tier A were then searched, but no weapons were found.

John Lambert, who was on guard duty with Menke, had two conversations with LaRue on the day in question. One was prior to the. assault when LaRue stated that the administration shouldn't let "snitches" out during the exercise period. Lambert testified that after the assault, LaRue called him over to his cell and made an unsolicited statement to the effect that "I told you I would do it."

James Duncan, another guard, talked to LaRue after the assault while he was in his segregation cell. Mr. Duncan admitted no warnings were given and that LaRue was the only suspect. Duncan stated that LaRue volunteered the information that he had broken a knife and flushed it down the toilet. To this, Duncan questioned, "Why?" LaRue responded that he did not like "snitches" on the tier.

A fourth guard, Garth Kinder, also talked with LaRue briefly about 10 to 15 minutes after the stabbing. He asked what was happening and LaRue told him he had warned the administration not to put "snitches" out on exercise with the other inmates and that something would happen if they did. He then inquired what happened to the knife, to which LaRue replied that he had flushed the knife down

the toilet. Kinder stated that no constitutional warnings were given prior to the conversation although LaRue was a suspect.

The Walla Walla Police Department was notified of the incident later on the same day. Police Officer Adams interviewed LaRue and advised him of his rights, but LaRue refused to make any statements. Written memos made by some of the guards were given to the police.

On January 10, 1977, a CrR 3.5 confession hearing was held concerning the admissibility of the above conversations. The court concluded that the statements were in fact made by LaRue who took the initiative in the conversations and made the statements voluntarily. The court also concluded that the correctional officers did not have a duty to advise LaRue of his constitutional rights because their primary function in this instance was to find and remove a dangerous weapon, not to pursue a criminal investigation.

Immediately prior to trial, new counsel for LaRue moved to suppress the admissions, based on the Washington Administrative Code relating to discipline procedures in adult correctional institutions. Specifically, counsel relied on WAC 275–88–035(2), which states:

> If a violation has been reported to law enforcement authorities the resident shall not be questioned about the incident until after it has been determined that no prosecution will occur or until a finding of guilt is made.

Counsel also relied on WAC 275–88–075(1) which requires that:

> A resident alleged to have committed a rule infraction shall be promptly advised of his right to remain silent at all stages of the investigatory proceedings.

The trial judge denied the motion on the basis that WAC 275–88–035(2) was not applicable because the officers' conversations with LaRue were not in connection with an investigation of the alleged assault, but were for the purpose of securing the area. Additionally, he found that WAC 275–88–075(1) is concerned strictly with rule infractions which are handled internally at the institution and is not

concerned with the type of situation contemplated by WAC 275–88–035(2), *i.e.,* a violation of law which is reported to law enforcement authorities.

It is Mr. LaRue's position that the statements made by him during the alleged conversations with the four prison guards should have been suppressed because they were elicited as part of a custodial interrogation during an accusatory stage of criminal proceedings and, as such, required that he first be advised of his constitutional rights.

*Miranda v. Arizona,* 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602, 10 A.L.R.3d 974 (1966), holds that the prosecution may not use statements stemming from custodial interrogation unless it is demonstrated that procedural safeguards were employed to secure a defendant's privilege against self–incrimination, *i.e.,* the well–known *Miranda* warnings. In the instant case, we must determine whether LaRue's statements were made during a custodial interrogation. If such a custodial interrogation is established, it makes no difference that the interrogators were prison guards, rather than police officers. The duty to apprise a defendant of his constitutional rights has been assigned to persons other than police officers. *See Mathis v. United States,* 391 U.S. 1, 20 L. Ed. 2d 381, 88 S. Ct. 1503 (1968) (statements made to IRS agent); *United States v. Redfield,* 402 F.2d 454 (4th Cir. 1968) (statements made to a prison warden); and *Biddy v. State,* 127 Ga. App. 212, 193 S.E.2d 31 (1972) (statements made to a prison warden).

First, LaRue contends that the statements were made while he was in custody. We agree. A prisoner is always in custody, and there is "nothing in the *Miranda* opinion which calls for a curtailment of the warnings to be given persons under interrogation . . . based on the *reason why the person is in custody.*" (Italics ours.) *Mathis v. United States, supra* at 4–5. In *Mathis,* the defendant, who was incarcerated for another crime, made incriminating statements to an IRS agent who interviewed him twice to determine whether he had prepared certain tax returns. The court held that these statements were inadmissible in

the defendant's subsequent trial for knowingly filing false claims because he had not been advised of his constitutional rights prior to making the statements. The court stated that the defendant need not be in custody for the crime for which he is being interrogated in order for *Miranda* to apply. It is the fact that the defendant is not free to go elsewhere, coupled with the interrogation, that calls for the application of *Miranda* to protect his right against self–incrimination.

Second, LaRue contends that he made the statements in response to an interrogation which focused on him as the accused. We disagree. Here, some of the statements made by the defendant were voluntary, and others were made in response to an on–the–scene investigation by prison officials for a dangerous weapon which presented a threat to the internal security of the penitentiary.

■ Statements given freely and voluntarily are admissible in evidence.

> The fundamental import of the privilege while an individual is in custody is not whether he is allowed to talk to [his custodians] without the benefit of warnings and counsel, but whether he can be interrogated.

*Miranda v. Arizona, supra* at 478. Here, LaRue initiated the conversation with guard Duncan and volunteered the information that he had broken the knife and flushed it down the toilet. He also volunteered to guard Lambert that "I told you I would do it," a reference to the prior conversation between himself and the guard in which he told Lambert that they shouldn't let "snitches" out during the exercise period.

The remainder of the conversation with Duncan and the conversations with both Menke and Kinder consisted of statements made in response to questions by these guards. Although not volunteered, these statements are not necessarily inadmissible. Rather, the statements are admissible unless the questioning had reached the accusatory stage,

*i.e.,* the questioning had focused on a suspect and the process lent itself to eliciting incriminating statements related to a crime where a prosecution might ensue.

In *People v. Sanchez,* 65 Cal. 2d 814, 423 P.2d 800, 56 Cal. Rptr. 648 (1967), a case similar to the one at hand, the court found that a question asked a defendant by a prison guard had not reached the accusatory stage. Our State has also considered this general problem on slightly different facts in *State v. Persinger,* 72 Wn.2d 561, 433 P.2d 867 (1967).

In *Sanchez,* a civilian foreman in the prison factory was fatally stabbed and a guard was summoned. Upon his arrival, he saw the victim and questioned in general the surrounding inmates, "Who did this?" Another civilian employee pointed to the defendant, who surrendered a knife to the guard. He searched the defendant immediately and upon seeing blood on his clothing, questioned him, "Why did you do it?" The defendant responded to the effect that it was because the foreman was going to report a sex violation on the defendant. No *Miranda* warnings had been given and the statement was later admitted at trial. The court determined that at this point the guard had not embarked on a process of interrogation that lent itself to eliciting incriminating statements. In reaching this determination, the court used the objective test stated in *People v. Stewart,* 62 Cal. 2d 571, 400 P.2d 97, 102, 43 Cal. Rptr. 201, 206 (1965). That test requires an analysis of the total situation surrounding the questioning through a consideration of such factors as the length of the interrogation, the place and time of the interrogation, the nature of the questions, the conduct of the authorities, and other relevant circumstances. The court decided that the two questions asked by the sole guard did not amount to an accusatory stage of the proceedings because the guard's concern was apprehension, and not interrogation. *People v. Sanchez, supra* at 823–24.

In *Persinger,* a defendant was found on the roof of one of the prison buildings immediately after another inmate had

descended from the roof on a rope and was wounded by prison guards. The guard who discovered the defendant asked him why he had not followed the other inmate down the rope. In response, the defendant stated that he was discouraged by the barking of the dogs and the tower guards' weapons. The statement was admitted at trial to prove the defendant's intent to escape. The reviewing court upheld the admissibility of the statement, noting:

> The casual, lone, and conversational inquiry by the captain of the guards simply did not amount to the type of "in custody interrogation" contemplated by the decision in *Miranda v. Arizona,* . . . and/or *Escobedo v. Illinois,* 378 U.S. 478, 12 L. Ed. 2d 977, 84 Sup. Ct. 1758 (1964). And, appellant's gratuitous expletive, and candid reply to the query cannot be characterized as one induced by any form of proscribed intimidation.

*State v. Persinger, supra* at 562. Here, Duncan testified that he asked LaRue "Why?" after LaRue had volunteered to him the information that he had broken the knife and flushed it down the toilet. Kinder testified that he came into the tier a few minutes after the stabbing and asked LaRue what was happening. As in *Persinger,* LaRue's replies to these conversational inquiries cannot be characterized as being induced by any form of proscribed intimidation.

As to the statements made by LaRue in response to Menke's questioning, we hold that they are admissible under the objective test espoused in *Sanchez.* We observe that the questions provoking these statements were asked by Menke within 8 to 10 minutes after the stabbing, immediately after Menke caused the victim to be removed to the prison's hospital. He testified that his purpose was not to investigate the crime. Rather, he "just wanted to get the weapon out of the area." His inquiry was limited to what happened to the knife, and he testified that his conversation with LaRue lasted only a minute or two. The defendant was questioned in his cell, the officer standing on one side of the bars and he on the other. A fair reading of the

record indicates that Menke's primary concern was securing the prison area, not interrogating LaRue.[1]

Finally, LaRue contends that his statements are inadmissible at trial because the prison guards violated the Washington Administrative Code in failing to advise him of his right to remain silent. We disagree.

■ The purpose of the administrative rules is to provide a standardized system consistent with constitutional due process for ascertaining whether misconduct by a resident in an adult correctional institution has occurred. WAC 275–88–005. These rules are merely a codification of *Miranda* requirements for use by a correctional institution when investigating internal misconduct. The same analysis under *Miranda* would be applicable to the administrative rules. Since we have determined that the defendant's statements were either volunteered or a result of an investigation to locate a dangerous weapon, the statements are admissible under the Washington Administrative Code.

Affirmed.

MUNSON, C.J., and ROE, J., concur.

Reconsideration denied May 16, 1978.

Review denied by Supreme Court October 20, 1978.

---

[1]The cases relied upon by Mr. LaRue are distinguishable.

In *Biddy v. State,* 127 Ga. App. 212, 193 S.E.2d 31 (1972), and in *State v. Tetzlaff,* 75 Wn.2d 649, 453 P.2d 638 (1969), the courts held that statements made by the defendants in response to questions concerning crimes that had taken place outside the prison were inadmissible because the defendants had not been advised of their constitutional rights. Also, in *United States v. Redfield,* 402 F.2d 454 (4th Cir. 1968), the court held inadmissible a statement made by the defendant during a prison disciplinary hearing in response to a question by the warden. In the present case, the questioning concerned a crime that had taken place inside the prison, and the questions were all asked within 10 to 15 minutes following the crime.