[No. 8091-1-I.   Division One.   January 26, 1981.]

THE STATE OF WASHINGTON, *Appellant*, v. HUGH
L. CHAMPION, *Respondent*.

*Russ Juckett, Prosecuting Attorney*, and *Asa Glazer* and
*James B. Roche, Deputies*, for appellant.

*Allison Lyon* of *Snohomish County Public Defender
Association*, for respondent.

SWANSON, J.—This appeal asks the court to decide the issue of what constituted an "arrest" under former CrR 3.3(b)(1)(b) for purposes of triggering the speedy trial time period. The State of Washington appeals the dismissal of an information against Hugh L. Champion. The information was dismissed on the ground that Champion's speedy trial rights had been violated.

A chronology of the significant events in this case follows:

5/09/79    The following facts were stipulated to by the parties as having occurred on this date:

A match bomb exploded in the Washington State Reformatory at Monroe. Guards found electrical components believed to match pieces from the bomb in the cell of Hugh L. Champion, the respondent in this appeal. Guards asked Champion to go to the Watch Commander's Office, located approximately 150 feet from Champion's cell. Champion agreed to go but would have been compelled to go had he refused. Champion was questioned there for 5 to 10 minutes, then taken to "administrative segregation."[1] He agreed to go *to segregation but would have been forced to go* had he not agreed. The guards were acting under the authority of WAC 275-82-015. They believed Champion "was a danger to the good order of the institution."[2] Champion was never read his *Miranda* rights nor told that he was under arrest.

---

[1] "'Administrative segregation' is any segregation of a resident of an adult correctional institution for nondisciplinary reasons." WAC 275-82-005.

"A resident may be placed in administrative segregation when it is shown by information brought out at a meeting that the resident:

"(a) is dangerous to himself, to others, or to the security of the institution;

"(b) is in danger from others." WAC 275-82-010(1).

[2] WAC 275-82-015 permits the placement of a resident in administrative segregation without a prior meeting if the superintendent of the institution "has reasonable cause to believe the resident is in immediate danger from others or is immediately dangerous to himself or to others or the security of the institution".

|          | His attorney stated that Champion was kept in segregation for 30 days. |
|----------|-----------------------------------------------------------------------|
| 8/06/79  | An information was filed in Snohomish County Superior Court charging Champion with possession of a weapon in violation of RCW 9.94.040. |
| 8/10/79  | A warrant for Champion's arrest was issued. |
| 9/09/79  | The arrest warrant was served. |
| 9/11/79  | Champion was arraigned. A trial date was set for 10/22/79. |
| 10/10/79 | Champion filed a motion to dismiss based on an alleged violation of CrR 3.3. |

The trial court granted Champion's motion and dismissed the information. The court found in its written order of dismissal,

> That the defendant was "arrested." within the meaning of *State v. McIntyre,* [92 Wn.2d 620, 600 P.2d 1009 (1979)] and *State v. LaRue,* 19 Wn. App 841, 578 P.2d 66 (1978) when he was removed from his cell and taken to the Washington State Reformatory Lt's office for interrogation. This action constituted further restriction upon the defendant. Such arrest constituted the triggering event of the Speedy Trial provisions of CrR 3.3, and occurred from stipulated facts upon May 19 [*sic*], 1979. Trial date did not occur within ninety (90) days following the 10th day of that arrest.

Former CrR 3.3(b)(1)(b) provided that, in the event a charge was initially filed in superior court, the speedy trial time limits began to run on the tenth day following the defendant's arrest.[3] The information in this case was initially filed in Snohomish County Superior Court. Determination of the date of Champion's arrest, therefore, is crucial in deciding whether his speedy trial rights under CrR 3.3 were violated. If Champion was arrested in May, his speedy

---

[3]Former CrR 3.3(b)(1) provided:

"The time limits set forth in subsections (b)(2) and (b)(3) shall commence to run from the date: (a) of the order binding the defendant over to the superior court following a preliminary hearing pursuant to JCrR 2.03 or (b) of the tenth day following the defendant's arrest in the event a preliminary hearing is not held or the charge is initially filed in the superior court."

trial time period expired in August. If, however, his arrest took place on September 9, when his arrest warrant was served, his scheduled trial date of October 22 was within the 90–day time limit of CrR 3.3.[4]

Considerable confusion surrounds the meaning of the term "arrest." Much of this confusion stems from the use of the word as a synonym for the type of "seizure" of the persons that under the Fourth Amendment must be supported by probable cause.[5] *See Dunaway v. New York,* 442 U.S. 200, 208, 60 L. Ed. 2d 824, 99 S. Ct. 2248 (1979); 2 W. LaFave, *Search and Seizure* § 5.1, at 216 (1978). Supreme Court decisions in recent years, however, have made clear that application of the Fourth Amendment does not depend on the occurrence of an arrest.

> It is quite plain that the Fourth Amendment governs "seizures" of the person which do not eventuate in a trip to the station house and prosecution for crime—"arrests" in traditional terminology. It must be recognized that whenever a police officer accosts an individual and restrains his freedom to walk away, he has "seized" that person.

*Terry v. Ohio,* 392 U.S. 1, 16, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1968). *See Dunaway v. New York, supra* at 208–09.

---

[4]Former CrR 3.3(b)(2) provided:

"A defendant unable to obtain pretrial release from custody shall be brought to trial within 60 days of the applicable event set forth in [CrR 3.3(b)(1)]."

Former CrR 3.3(b)(3) provided:

"A defendant who is released from custody shall be brought to trial within 90 days of the applicable event set forth in [CrR 3.3(b)(1)]."

Although Champion remained in custody at the Washington State Reformatory pending trial on this charge, his confinement there was not based on this charge. Therefore, the applicable speedy trial time period under former CrR 3.3(b)(3) was 90 days. *See State v. Keith,* 86 Wn.2d 229, 543 P.2d 235 (1975); *State v. Ogden,* 21 Wn. App. 44, 584 P.2d 957 (1978).

[5]The fourth amendment to the United States Constitution provides:

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

*Terry v. Ohio, supra,* recognized for the first time an exception to the Fourth Amendment requirement that a seizure of a person be based on probable cause to believe that the person has committed or is committing a crime. *Terry* held that a police officer may temporarily detain and pat down a person for weapons under circumstances amounting to less than probable cause. The court concluded that such a procedure was "reasonable" under the facts of the case and, thus, not violative of the Fourth Amendment's prohibition of "unreasonable searches and seizures." *Terry,* at 27. The weapon recovered in the search of the suspect in *Terry,* therefore, was held to have been properly admitted into evidence. *Terry,* at 31.

In *State v. Byers,* 88 Wn.2d 1, 559 P.2d 1334 (1977), the court was presented with a similar Fourth Amendment issue. A car was stopped by the police and the occupants returned 3 miles to the scene of a suspected burglary. The court held that the passengers' subsequent confessions to the burglary should have been suppressed because the confessions had been made pursuant to a seizure that violated the Fourth Amendment because it was not based on probable cause.

In spite of the admonitions of *Terry v. Ohio,* however, the *Byers* court framed the issue not in terms of a "seizure" without probable cause but in terms of an "arrest" without probable cause. *Byers,* at 7. The court stated that "[a]ppellants were under arrest from the moment they were not, and knew they were not, free to go." *Byers,* at 6. As a statement of Fourth Amendment law, this definition was inadequate. As *Terry* made clear, a defendant may be forcibly detained by the police, *i.e.,* "not free to go," under circumstances falling short of an arrest. This definition, furthermore, was merely dicta because the issue of the legality of the seizure of the defendants was not before the *Byers* court.[6]

---

[6]*Byers,* at 11–12 (Revelle, J., concurring).

The *Byers* definition of "arrest" was also a departure from previous definitions of "arrest" in Washington and from the traditional common law definition of the term.

An arrest is the initial stage of a criminal prosecution. It is . . . inevitably accompanied by future interference with the individual's freedom of movement, whether or not trial or conviction ultimately follows.

(Footnote omitted.) *Terry v. Ohio, supra* at 26.

An arrest, as the term is used in criminal law, signifies the apprehension or detention of the person of another in order that he may be forthcoming to answer for an alleged or supposed crime.

5 Am. Jur. 2d *Arrest* § 3 (1962). Washington courts have held that "a person is placed under arrest when he is deprived of his liberty by an officer who intends to arrest him." *State v. Sullivan,* 65 Wn.2d 47, 51, 395 P.2d 745 (1964); *Seattle v. Sage,* 11 Wn. App. 481, 485, 523 P.2d 942 (1974).

In an opinion that tacitly acknowledges the inadequacy of the *Byers* definition of "arrest," the Washington Supreme Court recently clarified the basis on which a Fourth Amendment seizure of a person may be made.[7] Meanwhile, however, the *Byers* definition had already found its way into an opinion interpreting the meaning of the word "arrest" in former CrR 3.3(b)(1)(b).

---

[7]The court said in *State v. Thompson,* 93 Wn.2d 838, 840–41, 613 P.2d 525 (1980):

"All seizures of the person, even those involving only brief detentions, must be tested against the Fourth Amendment guaranty of freedom from unreasonable searches and seizures. *United States v. Brignoni–Ponce,* 422 U.S. 873, 878, 45 L. Ed. 2d 607, 95 S. Ct. 2574 (1975); *Terry v. Ohio,* 392 U.S. 1, 17, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1968). To conduct a full arrest of an individual, the officer must have probable cause to believe that an offense has been or is being committed. *E.g., Brinegar v. United States,* 338 U.S. 160, 175–76, 93 L. Ed. 1879, 69 S. Ct. 1302 (1949). An investigatory stop short of an arrest may be made on less than probable cause. *Terry v. Ohio, supra.* An officer making such an investigatory stop, however, is required by the Fourth Amendment to have a reasonable suspicion, based on objective facts, that the individual is involved in criminal conduct. *Brown v. Texas,* 443 U.S. 47, 51, 61 L. Ed. 2d 357, 99 S. Ct. 2637 (1979); *see Terry,* at 21–22."

In *State v. McIntyre,* 92 Wn.2d 620, 600 P.2d 1009 (1979), police were investigating an alleged statutory rape. During their investigation, they asked the defendant on December 5, 1978, to go to the police station. The defendant did so in his own vehicle. The defendant was searched and interrogated at the station, then released. On December 26, 1978, the police mailed a report to the prosecutor's office, which filed an information on January 31, 1979, charging the defendant with the crime.

The issue before the *McIntyre* court was the date the speedy trial time period commenced under former CrR 3.3(b)(1). The court affirmed the trial court's dismissal of the case on the ground that the rule required that the time period commence on the tenth day following the defendant's arrest. The court stated at page 623:

> It was stipulated and was found by the trial court that the December 5, 1978, incident was an "arrest", as the term is defined in *State v. Byers,* 88 Wn.2d 1, 559 P.2d 1334 (1977).
>
> "Arrest" has been defined in *State v. Byers, supra* at 6, as follows: "Appellants were under arrest from the moment they were not, and knew they were not, free to go."

The parties' stipulation to the date of arrest in *McIntyre,* however, rendered the court's discussion of "arrest" merely dicta. We also observe that the police' treatment of the defendant in *McIntyre* had many of the earmarks of an arrest in the traditional criminal law sense. We are convinced, therefore, that the *McIntyre* opinion does not foreclose our reexamination of the issue of the meaning of the term "arrest" in former CrR 3.3(b)(1)(b).

■■ We conclude that the *Byers* definition of "arrest" is inadequate for purposes of the application of former CrR 3.3(b)(1)(b). Literal application of the *Byers* definition to speedy trial issues under the former rule would have unfortunate results in many situations. Police have numerous brief but coercive contacts with citizens which fall short of arrests in the traditional sense. *See Terry v. Ohio, supra.*

The police could not be expected to report each of these contacts to the local prosecuting attorney for possible future computation of speedy trial time periods. Furthermore, need for additional investigation after these contacts may mean that weeks or months pass before police are able to make a formal arrest of a suspect who had been previously detained. Therefore, if initial *Terry*–type contacts should ultimately result in arrest and criminal prosecution, adoption of the *Byers* definition of "arrest" under the former rule would result in the probable dismissal on speedy trial grounds of many of those cases. Application of the traditional criminal law definition of "arrest" would, however, provide clearer guidelines to police and the prosecution without endangering the defendant's rights. We assume that the purposes of the speedy trial rule correspond with those of the speedy trial provision of the Sixth Amendment:

> to prevent undue and oppressive incarceration prior to trial, to minimize anxiety and concern accompanying public accusation and to limit the possibilities that long delay will impair the ability of an accused to defend himself.

*United States v. Ewell*, 383 U.S. 116, 120, 15 L. Ed. 2d 627, 86 S. Ct. 773 (1966). Application of the traditional definition of "arrest" to former CrR 3.3(b)(1)(b) would not violate any of these objectives.

Therefore, we hold that "arrest" in former CrR 3.3(b)-(1)(b) be construed to have its traditional criminal law meaning: The condition of being held to answer for a specific criminal charge.

The *Byers* definition of "arrest" is especially inappropriate in the prison context in which this case arose. "A prisoner is always in custody . . ." *State v. LaRue*, 19 Wn. App. 841, 845, 578 P.2d 66 (1978). A prisoner, then, is never "free to go" and under the *Byers* definition would be in a continuous state of arrest. Champion argues, without citation of authority, that *Byers* should be construed to stand for the proposition that a prisoner is "arrested" whenever

his freedom of movement in prison is further restricted. This argument overlooks the authority prison officials hold to restrict a prisoner's freedom for the safety of himself or others in the prison. WAC 275-82-015. It was under this authority that Champion was placed in administrative segregation. To hold that each such restriction constitutes an "arrest" for purposes of former CrR 3.3(b)(1)(b) would impose unreasonable expectations on prison officials and prosecutors and would be an unreasonable construction of the former speedy trial rule. The trial court cited *State v. LaRue, supra,* as authority for the proposition that Champion was "arrested" when he was removed from his cell and taken for interrogation. *LaRue,* however, does not support this proposition. *LaRue* concerned the admissibility of statements made by a prisoner to a prison guard. The court was asked to determine whether the statements were made in the course of a custodial interrogation and, hence, required to have been preceded by a reading of the defendant's constitutional rights. The court concluded that the defendant, by virtue of his status as a prisoner, had been in custody but that his statements had not been made pursuant to interrogation. The court held that the defendant's statements were either voluntary or in response to the guard's search for a dangerous weapon "which presented a threat to the internal security of the penitentiary." *LaRue,* at 846.

A case more relevant to the issue at hand is *State v. Herr,* 70 Wn.2d 446, 423 P.2d 631 (1967). There, an inmate at the state penitentiary was placed in more restrictive custody after assaulting a guard. Several months later, the prosecuting attorney filed an information charging him with assault. An arrest warrant was subsequently served on the inmate. The court held that the defendant's constitutional right to a speedy trial had not been violated:

> The action of the prison officials in . . . removing him from his cell and thereafter placing him in more restrictive custody within the prison did not constitute an "arrest" in the accepted sense of the term. At best, it

290

amounted to no more than appropriate administrative disciplinary action. *Cf. State v. Williams,* 57 Wn.2d 231, 356 P.2d 99 (1960). Such action did not operate to transpose his custodial status from that of inmate to that of an arrested person awaiting trial. Neither did it invest him with any such dual role. The dual custody mantle of an "arrested inmate" first descended upon him on October 19, 1965, when the processes of the superior court were invoked and he was served with a warrant of arrest. Until that time he was simply an inmate serving time upon his outstanding sentence.

*Herr,* at 448–49.

We hold on the basis of the *Herr* case and the preceding discussion that the dismissal of the information in the instant case was in error. The stipulated facts reveal that, in restricting Champion, prison officials were acting for the "good order of the institution." The stipulated facts do not show that prison officials intended to arrest Champion in the traditional sense, *i.e.,* to hold him to answer for a criminal charge. *See State v. Sullivan, supra; cf. State v. LaRue, supra* (held, no interrogation partly because prison guard did not intend to interrogate). Nor does any other evidence suggest that Champion was so held to answer by the actions of the prison officials. Therefore, although Champion was not "free to go" when he was questioned on May 9 about the bomb explosion, he was not arrested in the applicable meaning of the term until September 9 when he was served with an arrest warrant. His trial date of October 22, therefore, was within the limits of former CrR 3.3(b)(3), and his speedy trial rights under that rule were not violated.

The order of dismissal is reversed, and the case is remanded for trial.

WILLIAMS and ANDERSEN, JJ., concur.