[No. 46751. En Banc. September 11, 1980.]

THE STATE OF WASHINGTON, *Respondent,* v. CLAUDIA
M. THACKER, *Petitioner.*

*John J. O'Connell,* for petitioner.

*C. Danny Clem, Prosecuting Attorney,* and *Richard L. Peterson, Chief Criminal Deputy,* for respondent.

WILLIAMS, J.—The State of Washington brought a charge of second degree murder against petitioner Claudia Thacker, alleging that she shot and killed her husband, Kenneth, on the afternoon of September 5, 1977. At trial, petitioner argued that the homicide was justifiable because she was acting in self–defense and defense of her children. A major factual issue, therefore, was whether at the time of the incident petitioner had reasonable grounds to believe that her husband intended to harm her or the children.

Prior to trial, the court appointed two psychiatrists, Dr. Ehly and Dr. Hollenbeck, to examine petitioner as to her sanity and competency. The interview with Dr. Ehly was tape–recorded and transcribed. During cross–examination at trial, the prosecuting attorney confronted petitioner with the transcript of the interview by reading parts of it in question and answer form:

Q Before this day, before September 5th, you had thought about shooting your husband, hadn't you? A No sir. Q Do you remember when you talked to Doctor Ehly? A I talked to Doctor Ehly. Q Didn't you tell him that? A No, sir. Q What I am referring to is the conversation you had with Doctor Ehly that was tape–recorded. Remember that? A Yes, I do. Q And its been typed up. A Yes.

. . .

Q Mrs. Thacker, I am referring to the first time you talked to Doctor Ehly. Do you remember when he asked you this question? "Question: When would you actually think about shooting him with the gun, what would be the situation?" Do you remember that question? A I don't quite remember, but I know Doctor Ehly asked me if I ever had the thought. Q Well, do you remember what you told him after he asked you about thinking about shooting your husband? A I told him no, I never had the thought, and he told me that he didn't believe me; and, if I recall, I told him I never had the thought, sometimes I just wish he would drop dead. But I never, never wanted to get involved in ... Q Well, when he asked you this

question: "Question: When would you actually think about shooting him with the gun, what would be the situation?" Your Answer was: "Answer: What he would do to me." The next question was: "Question: When would you think about shooting him, under what circumstances?" And Your answer was: "Answer: If he beat me up very bad, but mostly I could take a beating. Not that I, you know, I don't want you to think that I enjoyed it, I didn't, and I sure didn't want it, but I thought, well, if he hurt me I could take it. I didn't want him to hurt the children." The next question: "Question: Well, when would you have thought about killing him?" And your answer: "Answer: If he hurt the kids." Don't you remember telling Doctor Ehly that? A I don't quite remember. No, I don't I'm sorry.

. . .

Q And do you remember telling Doctor Ehly that you thought about using the gun? A I don't remember. Q Well, do you remember this question: "Question: I know, I know, I know, but you had thought about it, that the gun could possibly be used to protect the children if he would have lost control?" And your answer: "Answer: Yes." A I don't remember it, but I am sure that I could have said it, yes. Q You don't remember talking to him about that, this doesn't ring a bell? A I don't remember very much detail, the first detail that the doctor had. Q Well, are you telling the jury that you never, ever thought about it until the day it happened? A No, I don't. I had sometimes, you know, when he beat me up, I would just maybe say to myself, well, I wish you would just drop dead. But I never, never, never wanted to be involved in it, never.

. . .

Q You are telling the jury right now that you never thought about using that gun to shoot your husband before September 5th? A I never had the thought? Q I'm not trying to be tricking you, Mrs. Thacker. My question is, from your conversation with Doctor Ehly, you told him about using the gun before. Now you are telling the jury that you never thought about using the gun before? A I don't recall saying that to Doctor Ehly. If it is there, what I told him, but it never came to my mind. I never wanted to take—to injure him.

As the record reveals, petitioner either denied making the statements to Ehly or failed to recall them. No extrinsic evidence of the statements was formally introduced, and Ehly did not testify.

After petitioner was excused, her attorney indicated that he intended to call one more witness, Dr. Hollenbeck, who had apparently examined petitioner on the same day as Ehly and who would be available to testify the following day. In his offer of proof, defense counsel stated that Hollenbeck would testify that petitioner had suffered from post–traumatic amnesia at the time of her interview with Ehly, that her wish that her husband "would drop dead" was a normal fantasy, and that she felt apprehension for herself and her children. The prosecutor objected that the defense had not met its discovery obligations because the State had not received notes or transcripts of Hollenbeck's interview. The trial judge stated that he was not making a final ruling, but was "inclined to allow Doctor Hollenbeck's testimony", and offered the prosecutor an opportunity to talk to the psychiatrist. The State then put on its rebuttal witnesses.

When the defense attempted to call Hollenbeck on the following day, the prosecutor objected on the basis that the psychiatrist had been removed from the witness list and that in the omnibus hearing prior to trial, the judge had signed an order precluding the defense from calling unlisted witnesses.[1] The defense, which had apparently removed Hollenbeck's name from the witness list because of a concern for waiving the physician–patient privilege, stated that it needed Hollenbeck as a rebuttal witness to counter the testimony that the prosecution had elicited by reading portions of the transcript of Ehly's interview with petitioner. The trial judge, declaring that he was bound by the omnibus order, ruled that Hollenbeck could not testify.

The jury found petitioner guilty of second degree felony murder, and the Court of Appeals affirmed the conviction

---

[1]The omnibus order was not made part of the record on appeal.

in an unpublished opinion. The sole issue under review in this court is whether the trial court erred in not allowing Hollenbeck to take the stand as a rebuttal witness to counter the damaging "impeaching" statements read in front of the jury by the State.

■ Suppression of evidence is not one of the sanctions available for failure to comply with the discovery rules. CrR 4.7(h)(7); *State v. Lewis,* 19 Wn. App. 35, 47–48, 573 P.2d 1347 (1978); *State v. Stamm,* 16 Wn. App. 603, 610, 559 P.2d 1 (1976). The omnibus hearing order, which the trial judge decided was binding, evidently required exclusion as a sanction for failure to list witnesses. The Court of Appeals correctly concluded that the trial court's exclusion of Hollenbeck for this reason was improper.

The Court of Appeals determined nonetheless that there was a justifiable basis for exclusion of the witness. We have held that if a witness denies making a prior inconsistent statement, and no extrinsic evidence of that statement is subsequently introduced, then the trial court may disallow testimony which explains the statement on redirect examination. *Pierce v. Seattle Elec. Co.,* 83 Wash. 141, 147–48, 145 P. 228 (1915); *Surry v. Seattle Taxicab Co.,* 117 Wash. 559, 561–62, 201 P. 754 (1921); *see also* 5 R. Meisenholder, Wash. Prac. § 297 (1965). The rationale is that no impeachment evidence has been introduced into evidence which calls for an explanation. *Surry,* at 562; *Pierce,* at 147. Since petitioner either denied making the statements or did not recall them, *and* the Court of Appeals found that no evidence of the statements was introduced, it applied *Pierce* to hold there was nothing in evidence for petitioner or another witness to "explain away". The court found therefore that exclusion of Hollenbeck's testimony was proper.

■ We think reliance on *Pierce* in this situation is misplaced for two reasons. First, we expressly stated in *Pierce* that a trial judge in the exercise of his discretion could properly permit explanatory testimony related to the statements mentioned in the impeaching question. *Pierce,* at

148. It is thus too narrow a reading of *Pierce* to say that a defendant is never entitled to introduce evidence which would "explain away" statements not introduced into evidence. In this case, the trial judge indicated that, had he been free to exercise his discretion, he would have permitted Hollenbeck to offer explanatory testimony. As we have noted, however, he erroneously felt bound by the omnibus order and consequently did not exercise his discretion at all.

Second, the total effect of the cross–examination by the State was to give the impression that extrinsic evidence of the impeaching statements had been introduced into evidence. The prosecuting attorney made it known to the jury that petitioner's interview with Ehly had been tape-recorded and transcribed. He read portions of the transcript in question and answer form, a procedure which the jury could easily have concluded meant the statements were being introduced into evidence. The effect of this was that the State got the benefit of the impeaching testimony without exposing the impeaching witness to cross–examination. Under those circumstances, we think *Pierce* requires that petitioner should have been permitted to put on a witness for purposes of rehabilitation.

In addition, where the evidence was read into the record in this manner, the jury could have concluded that the statements were not only evidence of the impeaching statements, but were in fact substantive evidence. This conclusion is supported by the prosecutor's conduct during closing argument, in which he told the jury:

> When you are thinking about Murder in the Second Degree, consider the defendant's state of mind. *She thought about shooting him before September 5th, 1977.* This was not the first time she thought about shooting Mr. Thacker.

(Italics ours.) The only substantive evidence in the record was that petitioner *denied* ever having thought about shooting her husband, and Ehly's testimony to the contrary was never introduced in evidence.

■ The State contended at oral argument that the defense made no offer of proof relevant to the impeaching statements and that the trial court thus committed no error in refusing to let Hollenbeck testify. However, the record indicates defense counsel stated Hollenbeck would testify in part that petitioner's wish that her husband "would drop dead" was a normal fantasy. Such testimony was relevant to the extent of explaining that the statement did not imply a criminal intent or motive. The proposed testimony that she suffered from post–traumatic amnesia at the time of the interview with Ehly was also relevant, since it would bear on the reliability of the statement. While the offer of proof was not a model of clarity, we are of the opinion that it adequately represented to the court the grounds on which counsel thought the evidence admissible. *See Mad River Orchard Co. v. Krack Corp.*, 89 Wn.2d 535, 537, 573 P.2d 796 (1978). To the State's contention that there was no impeachment evidence that called for rehabilitation testimony, we reply that fairness prohibits the State from placing damaging statements before the jury and then retreating behind a technical rule of evidence to prevent explanatory testimony in rebuttal. *State v. Yoakum*, 37 Wn.2d 137, 222 P.2d 181 (1950).[2]

Where, as here, the total effect of the prosecutor's questioning was to give the jury the impression that the statements were properly in evidence, it was error to refuse petitioner's request to put on rebuttal testimony. As we held in a similar case:

> A person being tried on a criminal charge can be convicted only by evidence, not by innuendo. The effect of the cross–examination as conducted by the deputy prosecutor was to place before the jury, *as evidence,* certain

---

[2]Some courts have held that once a foundation is laid by confronting the witness with an alleged inconsistent statement which the witness denies, it is reversible error to fail to introduce extrinsic evidence of the statement. *E.g., United States v. Bohle*, 445 F.2d 54 (7th Cir. 1971), and citations therein; *People v. Moore*, 54 Ill. 2d 33, 37–38, 294 N.E.2d 297 (1973); *Goldstein v. Hertz Corp.*, 16 Ill. App. 3d 89, 97, 305 N.E.2d 617 (1973).

questions and answers purportedly given in the office of the chief of police, without the sworn testimony of any witness. This procedure, followed with such persistence and apparent show of authenticity, was prejudicial to the rights of appellant.

(Italics in original.) *Yoakum,* at 144.

The effect of the transcript on the jury in this case was not lost on defense counsel, who objected strenuously to the reading of the transcribed questions and answers:

> MR. REYNOLDS: Well, Your Honor, if Mr. Peterson intends to read from that document, I will object on the ground of hearsay. There is no foundation. Doctor Ehly isn't here to verify that any of these things were said. We're not afraid of the truth, but I do not think that we should have statements read from a tape–recorded transcript without a foundation. THE COURT: I will overrule the objection. As I understand the question, it is whether or not she remembers saying this.
>
> . . .
>
> MR. REYNOLDS: Judge, we don't know whether this is an accurate statement or not unless Doctor Ehly can be here to testify that that is what Mrs. Thacker said; and, without that foundation, it is inadmissible . . .

One question remains: Was the error nonetheless harmless? The standard for prejudicial error has been explained as follows:

> A harmless error is an error which is *trivial,* or *formal,* or *merely academic,* and was not prejudicial to the substantial rights of the party assigning it, and *in no way affected the final outcome of the case.*

*State v. Wanrow,* 88 Wn.2d 221, 237, 559 P.2d 548 (1977); *State v. Stephens,* 93 Wn.2d 186, 190, 607 P.2d 304 (1980).

Petitioner's primary defense was her claim that she was defending herself and her children from her husband. The statements allegedly made to Ehly attacked petitioner's truthfulness on this very issue, and petitioner thereupon sought to restore her credibility on this claim by introducing testimony explaining statements made by her and the circumstances under which they were made. We cannot say that a reasonable jury would not have believed petitioner to

284

be a more believable witness had the court allowed Hollenbeck to testify. Indeed, the jury may well have given enough weight to the unexplained statements read by the prosecutor to tip the balance in favor of the State. Since the error may have affected the final outcome of the case, we hold that it was not harmless.

The judgment of the Court of Appeals is accordingly reversed, and the case is remanded for a new trial.

ROSELLINI, STAFFORD, WRIGHT, BRACHTENBACH, HOROWITZ, DOLLIVER, and HICKS, JJ., and RYAN, J. Pro Tem., concur.

Reconsideration denied November 10, 1980.