[No. 49117–8.   En Banc.   June 7, 1984.]

THE STATE OF WASHINGTON, *Respondent,* v. JORGE
IVAN LAUREANO, *Appellant.*

*William M. Crawford, Crawford & McGilliard,* and *Fernando E. Perez Pena,* for appellant.

*C. Danny Clem, Prosecuting Attorney,* and *Kenneth G. Bell, Deputy,* for respondent.

*Michael A. Frost, Bryan P. Harnetiaux,* and *Douglass A. North* on behalf of Washington State Trial Lawyers Association; *Judith S. Dubester* on behalf of the Criminal Law Section of the Washington State Bar Association, amici

curiae for appellant.

PEARSON, J.—In the early morning hours of December 15, 1979, a robbery occurred at the home of Edward and Terry Friel in rural Kitsap County. The three robbers entered the Friel home while both residents were present. They took money from a safe, a quantity of cocaine from Ms. Friel, bound Ms. Friel, and forced her husband Edward to crawl into a back room of the house. They then shot Mr. Friel in the back of the neck with a 20 gauge shotgun. He died instantly.

Defendant Jorge Ivan Laureano was convicted in Kitsap County Superior Court of first degree murder for the killing of Edward Friel. Terry Friel, a key witness in the prosecution's case against the defendant, was hypnotized by the prosecution to enhance her ability to identify the perpetrators. The hypnosis session occurred before the identities of the three robbers were known or presumed. In accord with *State v. Martin*, 101 Wn.2d 713, 684 P.2d 651 (1984), where we found such hypnotically induced testimony inadmissible, we reverse defendant's conviction and remand for a new trial.

On appeal defendant raises 14 issues.

1. Did the trial court properly refuse to suppress pretrial and in-court identifications of defendant by Ms. Friel on the ground that her identification was improperly induced by hypnosis?

2. Was the defendant denied his right to a speedy trial under CrR 3.3?

3. Did the trial court abuse its discretion by refusing to grant defendant's motion for change of venue because of pretrial publicity?

4. Did the trial court abuse its discretion by refusing to allow individual voir dire for each prospective juror?

5. Did the trial court properly refuse to dismiss murder charges against the defendant because of the prosecution's alleged failure to preserve potentially exculpatory evidence?

6. Did the trial court properly allow the prosecution to amend its information to charge the defendant in the alternative with felony murder?

7. Did the trial court properly refuse to exclude the testimony of witnesses described in the second supplemental list of State's witnesses or in the alternative to dismiss the case for failure to comply with discovery rules?

8. Did the trial court abuse its discretion by allowing the prosecution to introduce evidence of another robbery in its case in chief?

9. Did the trial court properly admit evidence of defendant's prior robbery conviction for impeachment purposes?

10. Did the trial court abuse its discretion by refusing defendant's request for additional peremptory challenges to prospective jurors?

11. Did the trial court err in allowing Martha Lipp, a Spanish speaking interpreter, to use typed transcripts of interviews with defendant when she testified regarding her recollections of the interviews, and by admitting the transcripts into evidence?

12. Did the trial court properly exclude defendant's proffered expert testimony regarding the reliability of eyewitness identifications?

13. Did the trial court properly refuse defendant's proffered jury instruction regarding the reliability of an eyewitness identification by a person of a different race or ethnic origin?

14. Did the trial court properly refuse defendant's proffered jury instructions regarding the law of complicity in the criminal activity of others?

I

Terry Friel was the only witness to the shooting and killing of Edward Friel. Soon after the killing, Ms. Friel was interviewed by Detective Bertholf of the Kitsap County Sheriff's Department. Ms. Friel described one of the suspects to be approximately 5 feet 11 inches tall, weighing

about 160 pounds, 28 to 30 years of age, with afro–style hair and wearing a green army–type jacket. She told detectives this suspect was possibly a light–skinned black man who was armed with a pistol, and that he apparently was the leader of the robbers. In her interview, Ms. Friel said most of the conversation between the robbers was in a foreign language.

On December 16, 1979, Ms. Friel worked with Detective Mossman and an artist from the sheriff's department to complete composite drawings of the robbery suspects. Additional composite drawings were rendered on January 9, 1980. Ms. Friel was hypnotized for the January 9 session with the artist.

On January 7, 1980, the home of Mr. and Mrs. William Sackman in rural Kitsap County was robbed at gunpoint by James Turner, Julio Malave, and the defendant. Shortly after the Sackman robbery, Kitsap County Sheriff's deputies searched Laureano's home. In addition to items implicating Laureano in the Sackman robbery, deputies found a pistol and several 20 gauge shotgun shells of the same weight as the shell used to kill Edward Friel. Sheriff's deputies also found marijuana packaged in a manner identical to the way Edward Friel packaged marijuana for sale.

On February 23, 1980, Detective Bertholf showed Ms. Friel a photo montage without defendant's picture. Ms. Friel was unable to identify a suspect from the photo montage. One month later, on March 22, 1980, Detective Bertholf again presented a photo montage to Ms. Friel, this time including defendant's picture in the montage. Ms. Friel identified Laureano from the montage. Also, on March 22 Detective Bertholf showed Ms. Friel police photographs of Laureano, Julio Malave, James Turner, and Tony Cupic, a suspect in another Kitsap County murder case. Detective Bertholf told Ms. Friel that the person she identified from the photo montage, Laureano, was in custody.

On June 3, 1980, Laureano was sentenced for the Sackman robbery. Sheriff's deputies conducted a lineup on June 17, 1980, at which time Ms. Friel identified Laureano. He

was questioned extensively by detectives and on June 23, 1980, Laureano was charged with first degree murder for the killing of Edward Friel.

On June 30, 1980, Laureano pleaded not guilty to the first degree murder charges. Trial was set for August 25, 1980, but was later postponed until August 29. On August 13, 18, and 21, 1980, the Superior Court conducted pretrial hearings concerning a motion by defense counsel to change venue, mutual discovery requests, the filing of an amended information, and a motion by defense counsel for the appointment of expert witnesses. Both defense counsel and the Kitsap County Deputy Prosecutor indicated they were unprepared to commence trial by August 29. Defendant remained adamant, however, in his refusal to waive his rights under CrR 3.3.

On August 21, 1980, the Superior Court on its own motion ordered a continuance under former CrR 3.3(f)(2). The court found the delay was necessary for the due administration of justice, and that Laureano would not be prejudiced by the delay but rather it assisted in the preparation of his defense. The court accepted the suggestion of defense counsel that the trial be scheduled for October 13, 1980.

On September 2, 1980, the State filed an amended information charging Laureano with first degree murder, conspiracy to commit first degree murder, and conspiracy to commit first degree robbery. Defendant was rearraigned and pleaded not guilty to each count. On October 10, 1980, the court concluded the case was still not ready for trial and, again on its own motion under CrR 3.3(h)(2) (former CrR 3.3(f)(2)), postponed the trial until October 20, 1980. On October 17, 1980, Laureano for the first time moved to dismiss because of a speedy trial violation. The court denied this motion.

On October 20, 1980, trial commenced with voir dire of prospective jurors by means of written questionnaires. The court denied defendant's request for total individual voir dire, but allowed defense counsel to question 19 prospective

jurors individually. The court also denied defendant's request for a greater number of peremptory challenges than allowed under CrR 6.4(e)(1).

At trial, the prosecution produced the testimony of various witnesses regarding investigation and background of the case. Among others, Martha Lipp, the interpreter during interrogations of defendant, testified regarding her recollection of the interrogations. Over strenuous defense objections, Ms. Lipp was permitted to use her own transcription of the interrogations.

The prosecution, over defense objections, produced testimony of Laureano's prior conviction for robbery of the Sackman residence. The prosecution also called Terry Friel to testify. Over defense objections, Ms. Friel identified the defendant as one of the three men involved in the shooting death of her husband, Edward Friel.

The defendant produced numerous alibi witnesses. The defendant denied the charges and testified on his own behalf. Nevertheless, on November 14, 1980, Laureano was found guilty of first degree murder. On November 20, 1980, he was sentenced to a maximum term of life imprisonment. The court ordered defendant's sentence for first degree murder to run concurrently with the sentence he received for the Sackman robbery.

## II

Defendant argues that the trial court should have suppressed pretrial and in–court identifications by Terry Friel because her identification was improperly induced by hypnosis. In accord with our recent decision in *State v. Martin,* 101 Wn.2d 713, 684 P.2d 651 (1984), where we found hypnotically induced testimony inadmissible, we reverse defendant's conviction and remand for a new trial.

Ms. Friel was put under hypnosis by the prosecution on January 9, 1980. This hypnosis session occurred before the identities of any of the three robbers were known or presumed. The purpose of the hypnotic session was to elicit information that would aid the authorities in identifying

the perpetrators of the robbery and murder. On March 22, 1980, a photo montage was shown to Ms. Friel which included defendant's picture. She identified Laureano from the montage. On June 17, 1980, sheriff's deputies conducted a lineup at which Ms. Friel identified Laureano. At trial, Ms. Friel identified defendant as one of the three men who invaded her home and murdered her husband.

█ In *State v. Martin* we held such posthypnotic testimony inadmissible at criminal trials in this state. However, as in *State v. Martin,* our holding does not bar Ms. Friel from testifying as to facts recalled prior to her hypnosis if certain procedural safeguards are met. The procedural safeguards noted in *Martin* were established to insure that testimony of prehypnotic memories has not been tainted by the hypnotic process.

There is substantial support in the medical community that hypnotic techniques, as used by law enforcement personnel to enhance a witness's memory, are unreliable. Dr. Bernard L. Diamond, M.D., professor of law at the University of California at Berkeley, and clinical professor of psychiatry at the University of California at San Francisco, stated in a recent article:

> Even if the hypnotist takes consummate care, the subject may still incorporate into his recollections some fantasies or cues from the hypnotist's manner, or he may be rendered more susceptible to suggestions made before or after the hypnosis. A witness cannot identify his true memories after hypnosis. Nor can any expert separate them out. Worse, previously hypnotized witnesses often develop a certitude about their memories that ordinary witnesses seldom exhibit. . . . The plain fact is that such testimony is not and cannot be reliable. The only sensible approach is to exclude testimony from previously hypnotized witnesses as a matter of law, on the ground that the witness has been rendered incompetent to testify.

Diamond, *Inherent Problems in the Use of Pretrial Hypnosis on a Prospective Witness,* 68 Calif. L. Rev. 313, 348–49 (1980). *See also* Orne, *The Use and Misuse of Hypnosis in Court,* 27 Int'l J. of Clinical & Experimental Hypnosis

311 (1979).

For these reasons, where this technique has been used, we hold that all posthypnotic testimony should be rejected, and only the prior recall of the witness, properly preserved and documented (as set forth in *State v. Martin*), should be allowed in evidence.

Obviously, the authorities who hypnotized Ms. Friel did not know of *Martin*'s procedural safeguards. Therefore, on remand, in determining the admissibility of Ms. Friel's prehypnotic memories, the trial judge should determine whether there has been substantial compliance with these safeguards.

## III

The next issue is whether defendant was afforded a speedy trial. Prior to August 1, 1980, CrR 3.3(b) required that a defendant not released from jail pending trial be brought to trial within 60 days of the 10th day following arrest. CrR 3.3 was amended effective August 1, 1980. Defendant was charged for the Friel murder on June 23, 1980. Therefore, CrR 3.3 as it existed prior to August 1, 1980, applies for the purposes of determining the starting point of defendant's right to a speedy trial.

The two versions of CrR 3.3 are substantially identical regarding the trial court's authority to grant continuances. The trial court may grant a continuance as follows:

> On motion of the state, the court or a party . . . when required in the administration of justice and the defendant will not be substantially prejudiced in the presentation of his or her defense. The motion must be filed on or before the date set for trial or the last day of any continuance or extension granted pursuant to this rule. The court must state on the record or in writing the reasons for the continuance.

CrR 3.3(h)(2) (effective August 1, 1980); *accord,* former CrR 3.3(f)(2). When the trial court determines the trial date should be reset for any reason, the court must set a new date for trial and notify each counsel or party. CrR 3.3(f)(2); *accord,* former CrR 3.3(d)(2).

Defendant argues the date of his arrest for the purposes of computing the time in which a trial must be held under former CrR 3.3(b)(1) is June 5, 1980. He contends that he was being held in Kitsap County Jail after that date solely for the purpose of charging him with the Friel murder. Otherwise, defendant contends, he would have been transferred to the Washington State Corrections Center in Shelton under the sentence he received in connection with the Sackman robbery.

Defendant relies on the definition of arrest announced in *State v. Byers,* 88 Wn.2d 1, 6, 559 P.2d 1334 (1977). In *Byers,* two burglary suspects were confronted by sheriff's deputies as they left the scene of the crime. The deputies "requested" the suspects to accompany them back to the house where the burglary occurred. The *Byers* suspects were not formally "advised" that they were under arrest. 88 Wn.2d at 3–5. Nevertheless, the *Byers* court ruled that an arrest had occurred:

> Appellants were under arrest from the moment they were not, and knew they were not, free to go. *United States v. See,* 505 F.2d 845, 855 (9th Cir. 1974). "When the officers interrupted the two men and restricted their liberty of movement, the arrest, for purposes of this case, was complete." *Henry v. United States,* [361 U.S. 98, 103, 4 L. Ed. 2d 134, 80 S. Ct. 168 (1959)].

88 Wn.2d at 6. *Accord, State v. McIntyre,* 92 Wn.2d 620, 623, 600 P.2d 1009 (1979).

 The question of what constitutes an "arrest" for the purposes of former CrR 3.3 when the arrestee is already in custody for commission of another crime was specifically addressed in *State v. Champion,* 28 Wn. App. 281, 622 P.2d 905 (1981). In *Champion* the Court of Appeals criticized the *Byers* definition of what constitutes an "arrest", reasoning that "[t]he *Byers* definition of 'arrest' is especially inappropriate in the prison context in which this case arose." 28 Wn. App. at 288. According to the *Champion* court, "[a] prisoner, then, is never 'free to go' and under the *Byers* definition would be in a continuous state of arrest."

28 Wn. App. at 288.

We agree with the view expressed in *Champion* that the *Byers* definition of arrest is inappropriate when the arrestee is already in custody for commission of another crime. As stated by the *Champion* court, a more relevant case is *State v. Herr,* 70 Wn.2d 446, 423 P.2d 631 (1967). In *Herr,* an inmate at the state penitentiary was placed in more restrictive custody after assaulting a guard. Several months later, the prosecuting attorney filed an information charging him with assault. An arrest warrant was subsequently served on the inmate. The *Herr* court held that the defendant's right to a speedy trial had not been violated. As was stated in *Herr,* placing the inmate in more restrictive custody

> did not operate to transpose his custodial status from that of inmate to that of an arrested person awaiting trial. Neither did it invest him with any such dual role. The dual custody mantle of an "arrested inmate" first descended upon him . . . when the processes of the superior court were invoked and he was served with a warrant of arrest. Until that time he was simply an inmate serving time upon his outstanding sentence.

*Herr,* 70 Wn.2d at 448–49, *quoted in Champion,* 28 Wn. App. at 290.

In the present case, Laureano was not "arrested" for the purposes of CrR 3.3 until June 23, 1980, when he was formally charged with the Friel murder. His liberty was not restricted in any way on June 5, 1980, beyond his incarceration for the Sackman robbery. The original trial date of August 25, 1980, was well within the speedy trial requirements of CrR 3.3.

The subsequent postponement of the trial by the Superior Court, over the defendant's objection, did not violate the speedy trial rule. In compliance with former CrR 3.3(f)(2), the court found the continuance necessary for the due administration of justice, and that the defendant would not be prejudiced by the delay.

## IV

Next, we consider defendant's claim that the trial court abused its discretion by refusing to grant his motion for change of venue because of pretrial publicity. Upon motion of the defendant, the trial court may order a change of venue to any county in the state. CrR 5.2(b). The defendant's motion must be supported by affidavit that the defendant believes a fair trial is unattainable in the county where the action is pending. CrR 5.2(b)(2).

█ A motion for a change of venue in a criminal case is directed to the sound discretion of the trial court. *State v. Stiltner*, 80 Wn.2d 47, 52, 491 P.2d 1043 (1971). The trial court's decision regarding a change of venue motion will not be disturbed on appeal "absent a convincing showing of an abuse of discretion." *State v. Stiltner*, 80 Wn.2d at 52 (quoting *State v. Malone*, 75 Wn.2d 612, 614, 452 P.2d 963 (1969)). Defendant here failed to show that the trial court abused its discretion.

While defendant's due process rights are not violated merely by the existence of pretrial publicity, *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 565, 49 L. Ed. 2d 683, 96 S. Ct. 2791 (1976), they are violated where pretrial publicity prejudices the defendant's right to an impartial jury. *See, e.g., State v. Gilcrist*, 91 Wn.2d 603, 590 P.2d 809 (1979). The defendant need not affirmatively show actual prejudice resulting from pretrial publicity. *State v. Stiltner*, 80 Wn.2d at 54-55. A motion for change of venue must be granted where defendants show an apparent probability of prejudice to their right to an impartial jury. *Gilcrist*, 91 Wn.2d at 609.

In ruling on a motion for change of venue because of pretrial publicity, the trial court should consider the following factors:

(1) the inflammatory or noninflammatory nature of the publicity; (2) the degree to which the publicity was circulated throughout the community; (3) the length of time elapsed from the dissemination of the publicity to the date of trial; (4) the care exercised and the difficulty

encountered in the selection of the jury; (5) the familiarity of prospective or trial jurors with the publicity and the resultant effect upon them; (6) the challenges exercised by the defendant in selecting the jury, both peremptory and for cause; (7) the connection of government officials with the release of publicity; (8) the severity of the charge; and (9) the size of the area from which the venire is drawn.

*State v. Crudup,* 11 Wn. App. 583, 587, 524 P.2d 479, *review denied,* 84 Wn.2d 1012 (1974), *quoted in State v. Crawford,* 21 Wn. App. 146, 148, 584 P.2d 442 (1978), *review denied,* 91 Wn.2d 1013 (1979). The trial court may postpone its decision on a motion for change of venue until after the voir dire examination of prospective jurors. *See Crudup,* 11 Wn. App. at 589.

We hold that the trial court did not abuse its discretion by denying defendant's motion for change of venue. Newspaper articles and radio coverage concerning the Sackman robbery and Friel murder were primarily factual in nature. *See, e.g.,* The Bremerton Sun, Dec. 15, 1979, at 1, col. 4; Dec. 17, 1979, at 1, col. 1; Dec. 18, 1979, at 2, col. 2. While several articles, some of which might be characterized as inflammatory, appeared in The Bremerton Sun concerning the decision in *State v. Martin,* 94 Wn.2d 1, 614 P.2d 164 (1980) and the effect of the *Martin* decision upon the first degree murder prosecution of Tony Cupic, *see, e.g.,* The Bremerton Sun, July 16, 1980, at 1, col. 1; July 18, 1980, at 1, col. 1; July 24, 1980, at 9, col. 2, those articles do not mention the Laureano prosecutions. The right of defendant to a fair trial was not prejudiced by pretrial publicity. This ruling should not be interpreted as precluding defendant from raising this issue on retrial should additional publicity impair his right to a fair trial.

V

We cannot say that the trial court abused its discretion by refusing to allow individual voir dire of each prospective juror. The limits and extent of voir dire examination lie within the discretion of the trial court.

*State v. Robinson,* 75 Wn.2d 230, 231–32, 450 P.2d 180 (1969). However, the defendant should be permitted to examine prospective jurors carefully, "and to an extent which will afford him every reasonable protection." *State v. Tharp,* 42 Wn.2d 494, 499, 256 P.2d 482 (1953). The scope of voir dire should be coextensive with its purpose.

> The purpose of the inquiry is to enable the parties to learn the state of mind of the prospective jurors, so that they can know whether or not any of them may be subject to a challenge for cause, and determine the advisability of interposing their peremptory challenges.

42 Wn.2d at 499–500; *State v. Hunter,* 183 Wash. 143, 153, 48 P.2d 262 (1935). On retrial this test should be used to determine the extent of voir dire to be allowed.

## VI

Defendant claims there were three instances of prosecutorial misconduct occurring prior to his trial for first degree murder. First, the Kitsap County Prosecutor's office improperly failed to preserve potentially exculpatory evidence. Second, the prosecution improperly amended its information to charge him in the alternative with felony murder. Third, the State failed to comply with discovery rules, necessitating dismissal of the case against him or at least exclusion of witnesses described in the second supplemental list of State's witnesses. We reject each of these contentions.

## A

Terry Friel was interviewed during the early morning hours of December 15, 1979, by Detectives Bertholf and Wheeler of the Kitsap County Sheriff's Department. Laureano alleges that a tape recording of the interview was made, and that the failure of the State to produce the tape recording constitutes grounds for dismissal of the charges against him. Accompanying his motion for dismissal, defendant presented a statement by Detective Wheeler that a tape recording was made of the interview. In its findings of fact and conclusions of law regarding motion for dis-

missal due to lost or destroyed evidence, however, the trial court determined defendant failed to show that a tape recording was ever made. The trial court found that if a tape recording was made of the interview "its present existence and/or location is unknown and remains unknown after diligent search, and must be at this point presumed to be lost or destroyed".

■ The duty of the State to preserve material evidence is derived from the duty to disclose exculpatory evidence. *Brady v. Maryland*, 373 U.S. 83, 10 L. Ed. 2d 215, 83 S. Ct. 1194 (1963). The *Brady* Court adopted a materiality test holding that due process requires a state to disclose evidence when it is material to the issue of guilt or innocence. In *United States v. Agurs*, 427 U.S. 97, 49 L. Ed. 2d 342, 96 S. Ct. 2392 (1976), the Supreme Court applied the *Brady* rule to three distinct suppression situations. First, where prosecutorial misconduct is involved, a conviction "must be set aside if there is any 'reasonable likelihood'" that the undisclosed testimony could have affected the jury's decision. *Agurs*, 427 U.S. at 103. Second, if the defense has made a pretrial request for specific evidence, the test focuses on whether "the suppressed evidence might have affected the outcome". *Agurs*, 427 U.S. at 104. Third, where a general *Brady* request has been made or no request has been made at all, the duty to disclose evidence arises only if the "evidence creates a reasonable doubt that did not otherwise exist". *Agurs*, 427 U.S. at 112.

In *State v. Wright*, 87 Wn.2d 783, 557 P.2d 1 (1976), we extended the application of the duty to preserve material evidence to governmental loss or destruction of such evidence.

> [If the constitutional duty to disclose applied] only when the exact content of the non–disclosed materials was known, the disclosure duty would be an empty promise, easily circumvented by suppression of evidence by means of destruction rather than mere failure to reveal.

*Wright*, 87 Wn.2d at 788 (quoting *United States v. Bryant*,

439 F.2d 642, 648 (D.C. Cir. 1971)). Nevertheless, the *Wright* court acknowledged that cases involving the loss or destruction of material evidence pose a significantly different problem than the traditional nondisclosure cases in which the suppressed evidence is still in existence. *See Wright,* 87 Wn.2d at 787–89.

In *State v. Vaster,* 99 Wn.2d 44, 659 P.2d 528 (1983), we considered the problem of inadvertent or good faith loss or destruction of evidence by police or the prosecution. The *Vaster* court ruled under these circumstances the defendant has the burden of showing there is a reasonable possibility the missing evidence would have affected his ability to present a defense. *Vaster,* 99 Wn.2d at 52. If such a reasonable possibility is found, this must be balanced by the court against the ability of the prosecution to have preserved the evidence (considering the procedures established for preserving evidence), the nature of the missing evidence, and the circumstances surrounding its loss. *State v. Vaster, supra.*

On two previous occasions, we have considered the question of what constitutes "material" evidence for the purposes of applying the *Brady–Agurs* rule for lost or destroyed evidence. In *State v. Canaday,* 90 Wn.2d 808, 585 P.2d 1185 (1978), we ruled that used Breathalyzer ampuls were not "material" evidence in a prosecution for driving while intoxicated. *Canaday,* 90 Wn.2d at 815, 817. The *Canaday* court distinguished *State v. Wright, supra,* on the grounds that "[i]n *Wright* the evidence which was destroyed was the totality of the direct evidence in the case." *Canaday,* 90 Wn.2d at 816–17. According to the *Canaday* court:

[D]estruction of used Breathalyzer test ampoules . . . does not interfere with the defendant's ability to determine the facts or raise a defense of nonintoxication. Testimony to be gained from the ampoules is only tangential to the question of innocence or guilt.

90 Wn.2d at 817. Similarly, in *State v. Gilcrist,* 91 Wn.2d 603, 609, 590 P.2d 809 (1979), we rejected a claim that lost

hair samples found near the scene of the crime were "material" evidence:

The missing evidence was not necessary for a prima facie defense, and, at best, only would establish circumstantially appellants' innocence. Appellants' due process rights were not violated by the unavailability of the lost evidence.

In this case, the lost or destroyed tape recordings were not "material" evidence in the constitutional sense. It should be noted the trial court found, based on the evidence presented, there was "no showing that a tape recording of said interview with Terry Friel was ever made and that it ever existed, and that to assume the existence of said tape would be speculative." For the foregoing reasons, we hold that the trial court properly denied defendant's motion for dismissal because the tape recordings were lost or destroyed.

## B

On September 2, 1980, approximately 1 month before trial was scheduled to begin, the State filed an amended 3–count information charging Laureano with first degree murder (count 1), conspiracy to commit first degree murder (count 2), and conspiracy to commit first degree robbery (count 3). Defendant moved to have the amended information dismissed. The court granted defendant's motion and ordered trial to proceed on the original information. Upon prosecution motion, the court modified its earlier ruling and ordered the trial to proceed on count 1 of the amended information.

CrR 2.1(d) provides:

The court may permit any information to be amended at any time before verdict or finding if substantial rights of the defendant are not prejudiced.

It is well settled that defendants cannot claim error from the amendment of an information unless they are prejudiced thereby. *E.g., State v. Brown,* 74 Wn.2d 799, 801, 447 P.2d 82 (1968). *See State v. Jones,* 26 Wn. App. 1, 6, 612 P.2d 404 (1980); *State v. Graeber,* 46 Wn.2d 602, 605, 283

P.2d 974 (1955). The typical remedy for a defendant who is misled or surprised by the amendment of the information is to move for a continuance to secure time to prepare a defense to the amended information. *State v. LaPierre*, 71 Wn.2d 385, 388, 428 P.2d 579 (1967).

Due to our decision to remand this case for a new trial, there is no need to determine whether defendant was prejudiced by the amended information.

## C

A prosecuting attorney is required to disclose to the defendant the names and addresses of persons whom the prosecuting attorney intends to call at trial. CrR 4.7(a)(1)(i). This obligation is of a continuing nature. CrR 4.7(h)(2). Failure to comply with CrR 4.7 may result in an order compelling discovery, a continuance, or dismissal of the action. CrR 4.7(h)(7)(i). Suppression of evidence is not one of the sanctions available for failure to comply with the discovery rules. *State v. Thacker*, 94 Wn.2d 276, 280, 616 P.2d 655 (1980); *State v. Lewis*, 19 Wn. App. 35, 47–48, 573 P.2d 1347 (1978).

CrR 8.3(b) authorizes a trial court to dismiss any criminal prosecution "on its own motion in the furtherance of justice". The trial court's power to dismiss is discretionary and is reviewable only for manifest abuse of discretion. *State v. Dailey*, 93 Wn.2d 454, 456, 610 P.2d 357 (1980); *State v. Burri*, 87 Wn.2d 175, 183, 550 P.2d 507 (1976). To justify dismissal of a prosecution, the record must show "'governmental misconduct or arbitrary action". *State v. Burri*, 87 Wn.2d at 183 (quoting *State v. Starrish*, 86 Wn.2d 200, 205, 544 P.2d 1 (1975)). "'[G]overnmental misconduct' need not be of an evil or dishonest nature, simple mismanagement is sufficient." *State v. Dailey*, 93 Wn.2d at 457; *State v. Sulgrove*, 19 Wn. App. 860, 863, 578 P.2d 74 (1978). Nevertheless, dismissal of charges remains an extraordinary remedy, *see State v. Whitney*, 96 Wn.2d 578, 580, 637 P.2d 956 (1981), and is appropriate only if the defendant's right to a fair trial has been prejudiced in a

manner which could not be remedied by a new trial. *State v. Whitney, supra; State v. Baker,* 78 Wn.2d 327, 332–33, 474 P.2d 254 (1970).

In the present case, the State seems to have been dilatory in fulfilling its obligation under CrR 4.7(a)(1)(i). Nevertheless, we cannot say the trial court abused its discretion by refusing to dismiss the case against Laureano under CrR 8.3(b). Dismissal seems especially inappropriate since defendant steadfastly refused to allow his counsel to request a continuance to further prepare the case. *Cf. State v. Cohen,* 19 Wn. App. 600, 576 P.2d 933 (1978) (defendant's inability to prepare evidence for trial does not require dismissal where defendant failed to seek continuance).

## VII

Laureano was convicted in May 1980 of the armed robbery of Mr. and Mrs. William Sackman. Prior to trial in the present case, defendant moved to prohibit the State from introducing evidence of the Sackman robbery in its case in chief. Defendant also moved to exclude evidence of his conviction for the Sackman robbery for purposes of impeachment if he chose to testify on his own behalf. Both motions were denied by the trial court. Laureano now claims the trial court abused its discretion by allowing the State to introduce evidence of the Sackman robbery and his conviction for that crime. On the record before us, we reject defendant's contentions.

## A

At trial, the Superior Court denied defendant's motion to exclude evidence of the Sackman robbery from the State's case in chief. The trial court found that

admission of the evidence of the Sackman robbery is necessary for the prosecution to make proper showings of motive, intent, the existence of a common scheme or plan, knowledge, and, most importantly, identity, such showings being necessary given the nature of the charges in this case and the nature of the anticipated defense[.]

The trial court also found that "the probative value of such

evidence with respect to such issues is not substantially outweighed by the danger of unfair prejudice."

■ The admission or refusal of evidence lies largely within the sound discretion of the trial court. *Maehren v. Seattle,* 92 Wn.2d 480, 488, 599 P.2d 1255 (1979). A decision to allow certain evidence will not be reversed on appeal absent a showing of abuse of discretion. *See State v. Jones,* 95 Wn.2d 616, 628, 628 P.2d 472 (1981).

ER 404(b) provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

When deciding whether to allow evidence of other crimes, wrongs, or acts, the trial court must determine whether the danger of undue prejudice outweighs the probative value of the evidence in view of the availability of other means of proof and other factors. Comment, ER 404(b). *See State v. Whalon,* 1 Wn. App. 785, 464 P.2d 730 (1970). *See generally* Slough & Knightly, *Other Vices, Other Crimes,* 41 Iowa L. Rev. 325 (1956). ER 404(b) applies to evidence of other crimes or acts regardless of whether they occurred before or after the conduct for which the defendant was actually charged. 5 K. Tegland, Wash. Prac. § 114, at 280 (1982). *Accord, United States v. Webb,* 625 F.2d 709 (5th Cir. 1980).

The test for admissibility of evidence of another offense is whether it is relevant and necessary to prove an essential ingredient of the crime charged. *State v. Robtoy,* 98 Wn.2d 30, 42, 653 P.2d 284 (1982); *State v. Goebel,* 40 Wn.2d 18, 21, 240 P.2d 251 (1952). The method employed in the commission of both crimes must be so unique that mere proof that an accused committed one of them creates high probability that he also committed the act charged. *State v. Irving,* 24 Wn. App. 370, 374, 601 P.2d 954 (1979), *review denied,* 93 Wn.2d 1007 (1980). According to Professor

Meisenholder:

> Mere similarity of crimes will not justify the introduction of other criminal acts under the rule. There must be something distinctive or unusual in the means employed in such crimes and the crime charged.

(Footnotes omitted.) 5 R. Meisenholder, Wash. Prac. § 4, at 13 (1965), *quoted in State v. Irving,* at 374.

As the trial court stated, the crucial factor in this case was identity. The purpose of admitting testimony as to the Sackman robbery was to point out the quality of sameness between the two crimes so as to prove identity. 2 J. Wigmore, *Evidence* §§ 306, 410–13 (3d ed. 1940). In its ruling on the motion to exclude testimony of the Sackman robbery, the trial court found:

> That there exists a number of substantial similarities between these two crimes including: (1) that they occurred only approximately three weeks apart; (2) that they both involved the forcible entry of family residences; (3) that both crimes occurred after dark; (4) that both crimes involved three perpetrators, although not the same three in each instance; (5) that both crimes involved the presence of firearms by each of the persons entering the residence; (6) that in both cases one of the perpetrators was armed with a [20 gauge, 6 shot] shotgun, and said shotgun was used in a similar manner in each crime; (7) that both crimes involved perpetrators dressed in Army fatigues; and that the above list of similarities is illustrative in nature but is not exhaustive[.]

In addition to delineating the similarities between the Sackman robbery and the Friel robbery/killing, the court also weighed the necessity for admission of the robbery against its possible prejudicial effect on the jury. *State v. Tharp,* 96 Wn.2d 591, 637 P.2d 961 (1981).

While reasonable minds might differ as to whether the evidence of the Sackman robbery should have been admitted, on the record before us we find the court's decision was not manifestly unreasonable. *See State ex rel. Carroll v. Junker,* 79 Wn.2d 12, 482 P.2d 775 (1971). There was no abuse of discretion by the trial court. *See State v. Blight,* 89 Wn.2d 38, 40–41, 569 P.2d 1129 (1977).

B

Under ER 609(a), a prior conviction is admissible for impeachment purposes if either (1) the crime was a felony and "the court determines that the probative value of admitting this evidence outweighs its prejudicial effect to the defendant," or (2) the crime was one which "involved dishonesty or false statement". The test for admissibility of prior convictions is one of balancing. *State v. Pam,* 98 Wn.2d 748, 761, 659 P.2d 454 (1983) (Utter, J., concurring). Nevertheless, when a prior conviction has been admitted as substantive evidence under ER 404(b), that same conviction is admissible as a matter of course for impeachment purposes under ER 609(a). Therefore, on the record before us, the trial court properly allowed introduction of Laureano's prior conviction for impeachment purposes.

VIII

Defendant moved for a greater number of peremptory challenges than authorized by CrR 6.4(e)(1). The trial court denied defendant's motion for additional peremptory challenges. Defendant argues the Superior Court abused its discretion by refusing his request for additional peremptory challenges to prospective jurors. Due to our reversal of this case on other grounds, we find it unnecessary to reach this issue.

IX

Defendant's principal language is Spanish. Interrogation of Laureano by Kitsap County Sheriff's detectives was conducted through an interpreter, Martha Lipp. Ms. Lipp is an employee of the Kitsap County Sheriff's Department and is of Cuban descent. Defendant objected to the use of transcripts of Ms. Lipp's translations at trial. His principal objection is that Ms. Lipp was not properly qualified to act as an interpreter. The trial court admitted the transcripts as evidence and allowed Ms. Lipp to use the transcripts to refresh her recollection when she testified personally regarding the interrogations.

Since we have reversed this case on other grounds, we

find it unnecessary to rule whether the transcripts of the interrogation were properly allowed into evidence by the trial court. However, on the record before us, we find the trial court did not abuse its discretion in allowing Ms. Lipp to testify regarding the interrogations. Defendant was given ample opportunity to cross–examine Ms. Lipp regarding her qualifications as an interpreter. He also had the opportunity to cross–examine Ms. Lipp at trial regarding possible mistranslations during the interrogation session.

## X

At trial, the State moved to exclude the testimony of Dr. Elizabeth Loftus regarding the limitations of eyewitness identifications. The trial court granted the State's motion to exclude Dr. Loftus' testimony after an offer of proof was presented out of the jury's presence. Dr. Loftus' testimony was directed to Ms. Friel's identification of defendant Laureano. Since we have found Ms. Friel's identification tainted by hypnosis, and therefore excluded under *State v. Martin*, 101 Wn.2d 713, 684 P.2d 651 (1984), we find it unnecessary to rule on the admissibility of such expert testimony in the present case.

## XI

The remaining assignments of error concern the refusal of the trial court to grant certain jury instructions offered by the defendant. Defendant argues the Superior Court improperly refused his proffered jury instruction regarding the reliability of eyewitness identification by a person of a different race or ethnic origin. He also contends the trial court improperly refused his proposed instructions regarding the law of complicity in the criminal activity of others.

## A

Defendant's proposed instruction regarding the reliability of cross–racial or ethnic eyewitness identification[1]

---

[1] "One of the questions in this case is the identification of the defendant as the one who committed the crime. The prosecution has the burden of proving beyond a reasonable doubt, not only that the crime was committed, but that the defend-

was based on an instruction in *United States v. Telfaire,* 469 F.2d 552 (D.C. Cir. 1972). We have not yet ruled whether *Telfaire* instructions are appropriate. The Washington Court of Appeals, however, has rejected two *Telfaire* instructions differing from the one proposed in the present case, reasoning the instructions are "impermissibly slanted to the degree that [they] should not be given in Washington." *State v. Jordan,* 17 Wn. App. 542, 545, 564 P.2d 340 (1977); *State v. Edwards,* 23 Wn. App. 893, 896–97, 600 P.2d 566 (1979). Similarly, other state courts have rejected proposed *"Telfaire"* instructions. *See, e.g., State v. Valencia,* 118 Ariz. 136, 137–38, 575 P.2d 335 (1977); *State v.*

---

ant was the person who committed it.

"In considering whether the prosecution has proved beyond a reasonable doubt that the defendant is the person who committed the offense, you should consider the following:

"The witness's opportunity to observe the criminal acts and the person committing them, including the length of time available for observing; whether the witness had occasion to see or know the defendant before the incident; the distance between the various parties; the light or lack of light at the time; the witness's state of mind at the time of the offense; and other circumstances affecting the witness's opportunity to observe and recall the person committing the offense.

"In this case the identifying witness is of a different race than the defendant. In the experience of many it is more difficult to identify members of a different race than members of one's own. If this is also your own experience, you may consider it in evaluating the witness's testimony. You must also consider, of course, whether there are other factors present in this case which overcome any such difficulty of identification. For example, you may conclude that the witness has had sufficient contacts with members of defendant's race that he would not have greater difficulty in making a reliable identification.

"The identification made by the witness after the offense must be the product of his own memory. You may take into consideration any subsequent identification, the circumstances surrounding the identification, the certainty or lack of certainty expressed by the witness, the state of mind of the witness at the time, and other circumstances bearing on the reliability of the identification. You may also consider the length of time that elapsed between the occurrence of the crime and the time the witness saw the defendant as a factor bearing on the reliability of the identification.

"You must consider the credibility of each identification witness in the same way as any other witness, consider whether he is truthful, and consider whether he had the capacity and opportunity to make a reliable observation on the matter covered in his testimony. If after examining the testimony, you have a reasonable doubt as to the accuracy of the identification, you must find the defendant not guilty." Defendant's proposed instruction 1.

*Padilla,* 57 Hawaii 150, 162, 552 P.2d 357 (1976); *State v. Classen,* 31 Or. App. 683, 693–94, 571 P.2d 527 (1977). Likewise, we conclude that the trial court did not err in refusing the *Telfaire* instruction in the present case.

B

Defendant offered three jury instructions regarding the law of complicity. The proposed instructions essentially instructed that mere physical presence, without a showing that the defendant shared in the criminal intent of the principal, is not sufficient to convict the defendant of complicity to the criminal acts of the principal. The trial court rejected defendant's proposed instructions regarding complicity.

RCW 9A.08.020 provides that a person is guilty of a crime if it is committed by the conduct of another person for which he is legally accountable. The statute provides that a person is legally accountable for the conduct of another person when a person is an accomplice of such other person in the commission of the crime. To convict a person as an accomplice, the State must show the accomplice shared in the principal's criminal intent and participated in the venture. *State v. Boast,* 87 Wn.2d 447, 553 P.2d 1322 (1976).

Here, the trial court did not abuse its discretion by rejecting defendant's proposed instructions regarding the law of complicity. The State's accomplice instruction, accepted by the trial court, was identical to WPIC 10.51, 11 Wash. Prac. 97 (1977). The pattern instruction adequately instructs on the law of complicity. *State v. Parris,* 30 Wn. App. 268, 279, 633 P.2d 914 (1981). *See State v. Rotunno,* 95 Wn.2d 931, 933, 631 P.2d 951 (1981).

The judgment is reversed and the case remanded for a new trial.

WILLIAMS, C.J., and ROSELLINI, STAFFORD, BRACHTENBACH, and DORE, JJ., concur.

DOLLIVER, J. (dissenting)—While I concur with the rest

of the opinion of the majority, I dissent to part II dealing with the admissibility of hypnotically induced testimony. My general views on this subject have been expressed in my concurrence and dissent to *State v. Martin*, 101 Wn.2d 713, 684 P.2d 651 (1984) and will not be repeated here. If the kind of testimony in this case was of the same nature as that in *Martin*, I might join in the reversal and remand of the majority. It is not, and it is from these differences that this dissent springs.

When Terry Friel was put under hypnosis, January 9, 1980, the hypnosis session was conducted by a highly qualified psychologist who had particular training and experience in investigative hypnosis. Since the identities of the perpetrators of the crime were neither known nor presumed, the purpose of the hypnosis of Friel was to gain investigative leads.

An illuminating commentary is made by Martin T. Orne, M.D., Ph. D. Dr. Orne is cited as an authority by defendant, amici curiae, and the majority in their argument that the testimony of Friel be suppressed since she had been hypnotized during the investigation stage of the proceedings. In an article cited by amici curiae and the majority, Dr. Orne states:

> There are many cases involving a victim or a witness to a crime who cannot recall potentially important details and where the enforcement authorities are equally in the dark. In cases of assault, for example, hypnosis has made it possible for the victim to recall the assailant's appearance, enabling police artists to draw a reasonable likeness. To the extent that the victim or witness, police, artist, and hypnotist alike share no preconceived bias about what might have occurred, the situation approaches the ideal case for hypnosis to be most appropriately employed: to develop investigative leads.
>
> Hypnotic suggestions may directly or indirectly enhance memory by providing contextual cues, and the relaxed environment of a sensitively conducted session may help diminish the anxiety which otherwise interferes with attempts to recall. Several cases of this type are described by Kroger and Douce (1979). Many of the lim-

itations of the technique—even under such circumstances—have been emphasized earlier, while other pitfalls are described by Kroger and Douce. Given appropriate care, however, hypnosis has provided important new information to the authorities in many instances. If the sole purpose of the hypnotic session is to provide clues which ultimately lead to incriminating evidence, the fact that hypnosis was originally employed becomes irrelevant. However, if there is even the vaguest possibility that hypnotically enhanced recall is to be used in court, it is essential that the entire contact of the hypnotist with the subject be videotape–recorded in order to allow an independent assessment of the events preceding, during, and following the hypnotic session to determine whether or not the memories might have inadvertently been guided by cues in the situation.

Orne, *The Use and Misuse of Hypnosis in Court,* 27 Int'l J. of Clinical & Experimental Hypnosis 311, 328 (1979). Under the facts in this case, the fact that Friel was hypnotized is, in the words of Dr. Orne, "irrelevant".

No indication is made there was any improper suggestion. Indeed, since there were no known suspects at the time of the hypnosis, there would be little, if any, risk of suggestiveness. The record indicates the expert hypnotist was from outside the law enforcement agency directly concerned with the investigation. Furthermore, an audio recording of the entire hypnosis was made. This was made available to the defendant who employed an expert on hypnosis to review the session, but no mention was made of this during the trial. At no time during the trial did defendant make any effort to challenge the procedures employed or to demonstrate any suggestiveness either by the hypnotist or the police. Under these circumstances, it seems to me defendant has waived any complaint he may have had about the Friel testimony. Investigative hypnosis under the facts of this case did not render Friel incompetent to testify. *See* Annot., *Admissibility of Hypnotic Evidence at Criminal Trial,* 92 A.L.R.3d 442 (1979).

I would find no violation of defendant's rights to due process in the pretrial identification procedures. Terry Friel

772

was competent to testify; the trial court properly refused to suppress her testimony.

UTTER and DIMMICK, JJ., concur with DOLLIVER, J.

Reconsideration denied August 21, 1984.