IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 37788-1-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | UNPUBLISHED OPINION |
| SHAWN LEE VAN ZANDT, | ) | |
| | ) | |
| Appellant. | ) | |

FEARING, J. — Shawn Van Zandt appeals, on insufficiency of evidence and

prosecutorial misconduct grounds, his convictions for burglary and the violation of a

domestic violence protective order. We hold that sufficient evidence supported his two

convictions. We further hold that the prosecuting attorney committed error, but such

error was harmless. We affirm Van Zandt's two convictions.

FACTS

This prosecution arises from the relationship between appellant Shawn Van Zandt

(Van Zandt) and his mother Randee Van Zandt (Randee). According to the State's

information, on December 5, 2019, Randee procured an order for protection against her

son Van Zandt. The no-contact order listed Randee as the petitioner. The order expired

on March 5, 2020. The order excluded Van Zandt from Randee's residence and from

knowingly approaching within two blocks of her home.

Shawn Van Zandt signed no paper indicating that he received a copy of the protection order. A return of service avers that a law enforcement officer served him with the protection order on December 17, 2019.

We lack any testimony from Randee Van Zandt or Shawn Van Zandt. During the early morning hours of February 29, 2020, Spokane County Sheriff's Department Detective Michael Keys responded to a call that Van Zandt was violating a protection order by having entered the home of his mother, Randee. During trial, Detective Keys did not identify the caller to law enforcement. When responding to the call, Detective Keys reviewed the protection order. Keys entered Randee's home, located Shawn within, and arrested him. Van Zandt did not appear surprised to see a law enforcement officer in the home. Report of Proceedings (RP) (Aug. 25, 2020) at 168.

PROCEDURE

The State of Washington charged Shawn Van Zandt with felony violation of a domestic violence protection order and residential burglary. Shawn elected to defend himself pro se.

Before voir dire, the State's attorney commented to the trial court that Randee Van Zandt would not testify.

> [PROSECUTOR]: . . . The other comment I did have is that we attempted to contact Ms. Randee Van Zandt, who is the victim in this matter, last night. She informed us she was not going to be here and that

2

she would not be home so that we could not find her. I noted that the last trial that we went to, Mr. Van Zandt—excuse me, went to with Mr. Cruz, a material witness warrant was sought and granted. However, in this case, given the fact that there's a detective witness, the event in the home, and the fact that she is a rather elderly woman and we have COVID, I'm not going to seek a material witness warrant at this time. It doesn't—

MR. VAN ZANDT: Thank you.

[PROSECUTOR]: It doesn't impair the state's case, but I would like a little bit of extra time with the jury about why witnesses don't come for trial, your Honor.

. . . .

[PROSECUTOR]: Thank you.

MR. VAN ZANDT: (Hand raised.)

. . . .

MR. VAN ZANDT: I mean, his position on this, I—I wanted to say thank you. My mother's elderly and she's not competent to testify. She doesn't need to go through this thing. I appreciate it. Thank you, guys. Thank you.

RP (Aug. 25, 2020) at 84-85.

During voir dire, the trial court informed potential jurors that the State charged Shawn Van Zandt with violation of a protective order and burglary. In turn, the prosecutor questioned the venire panel about their views of domestic violence and protection orders. The prosecutor also broached the fact that Randee Van Zandt would not testify during the trial:

[PROSECUTOR]: So with domestic violence, there's always a victim that's involved. In this case the victim is Randee Van Zandt, who is Mr. Van Zandt's mother. Now, she will not be coming today. She was on the witness list, but she will not be coming today. So I want to talk to you a little bit about domestic violence victims. When we think of domestic violence victims, what do we think?

Number 13?

JUROR NO. 13: Um, people that have been harmed.

3

. . . .
[PROSECUTOR]: Okay. And people that have been harmed, how do you think they feel coming into this process?
JUROR NO. 13: Ah, nervous.
[PROSECUTOR]: Okay.
JUROR NO. 13: Upset.

RP (Aug. 25, 2020) at 124. The prosecutor continued:

[PROSECUTOR]: . . . Juror No. 14, can you think of a reason why a domestic violence victim wouldn't want to come testify in court?
JUROR NO. 14: I guess pride, shame, don't want other people to know, I guess. I don't know.
[PROSECUTOR]: Okay. When—so expand on that a little bit more for me. What do you mean by—by shame?
JUROR NO. 14: Well, I guess, I mean, if it's your family member, family's typically somebody you would trust, you know, somebody—and that. So if this happens, maybe they're—they feel ashamed that—
[PROSECUTOR]: Something happened to them?
JUROR NO. 14: —something happened to them and they didn't . . .
. . . .
[PROSECUTOR]: Juror No. 18, because you're right there next to the microphone, do you agree with what Juror No. 14 said?
. . . .
JUROR NO. 18: Not entirely sure what he was getting at with that—
[PROSECUTOR]: Okay.
JUROR NO. 18: —but, you know, everyone has their own opinions.
[PROSECUTOR]: Okay. For you, then, why—what are some reasons you can think why a domestic violence victim would not want to come and testify in court?
JUROR NO. 18: It's—I see it as something kind of—I don't know. I'm not entirely sure actually.
[PROSECUTOR]: Okay. Not entirely sure?
JUROR NO. 18: Yep.
[PROSECUTOR]: Okay. If you were a victim of domestic violence, why do you think you wouldn't want to come to court if something had happened to you?
JUROR NO. 18: You don't want other people to know. You don't want to be judged, I guess.

[PROSECUTOR]: Okay.  So similar to what Juror No. 14 was saying?  You don't want to be judged?  You're—you're sad that that happened to you?

JUROR NO. 18: Yeah.

RP (Aug. 25, 2020) at 125-26.  The prosecutor turned his attention to juror seventeen:

[PROSECUTOR]: . . .  Juror No. 17, for you, what are some reasons you can think of why someone would not want to come and testify if they're a victim?

JUROR NO. 17: Besides what's been expressed already, possibly the fact that their—the potential for future abuse.

[PROSECUTOR]: Okay.

. . . .

JUROR NO. 17: . . . I would think that they would be afraid of future abuse.  Restraining orders aren't the—timing-wise, they—they take too much time; somebody could re-abuse.

[PROSECUTOR]: Okay, thank you.  Does that—does that bother you that a victim wouldn't come in to testify?

JUROR NO. 17: I would need to know more about a particular case and why the person might not.

RP (Aug. 25, 2020) at 127.  The State's attorney questioned juror nineteen:

[PROSECUTOR]: . . . Juror No. 19, what about for you?  Would it bother you if a victim didn't come in to testify?

JUROR NO. 19: No.  Especially with domestic, I think situations where family dynamics and emotions are challenging and difficult.  And, you know, there's that—just I think that a victim sometimes can feel really vulnerable and might not be able to—to come in and—and—and face that person that they love but are also, you know, obviously very upset with.  So just . . .

[PROSECUTOR]: Okay, thank you.  I appreciate that.

RP (Aug. 25, 2020) at 128-29.  Finally, the prosecutor asked juror seven:

[PROSECUTOR]: . . . Juror No. 7, I'm going to pick on you again.  So same question: Does that bother you if the victim wasn't—show up to testify?

5

JUROR NO. 7: No, I don't think that it would bother me for them not to show up. Just like other people have expressed, it could just be a range of reasons why they wouldn't want to actually come to the courtroom. But, I mean, I guess I could see at the same time it would make me feel more confident in reaching certain verdicts—

[PROSECUTOR]: Mm-hm.

JUROR NO. 7: —if they were there so you could kind of judge their demeanor—

[PROSECUTOR]: Okay.

JUROR NO. 7: —not just read their statements on paper.

[PROSECUTOR]: Right. Okay, thank you. I appreciate that.

RP (Aug. 25, 2020) at 129. The prosecutor ended the line of questioning by posing a question to the entire panel:

[PROSECUTOR]: . . . Is there anyone here that would be bothered by the fact that a victim doesn't show up in this case, that Ms. Randee Van Zandt is not going to show up at trial today? Is there any—does that bother anyone?

RP (Aug. 25, 2020) at 129-30. No juror responded.

Shawn Van Zandt, as his own counsel, never objected to the prosecutor's questioning of the venire panel. He asked no questions of the panel himself. Van Zandt argued in opening that his arrest for violation of a domestic violence protective order rose from a rescinded October 5 protection order and that the December 5 protection order was fictitious.

During trial, Detective Michael Keys recounted visiting Randee Van Zandt's residence. The prosecution inquired about the return of service on Van Zandt of the domestic violence protection order, which Keys had not served.

6

[PROSECUTOR]: Okay. What's a return of service?

[DETECTIVE KEYS]: So when a law enforcement office on patrol serves an order on someone, we complete what's called a return of service documenting who we served the order to, how we served it, the location, date, and time. And then that is sent to the records department to show that the order was served and that the person that was served upon has knowledge of that order now.

. . . .

[PROSECUTOR]: And then, Detective Keys, on that second page, could you tell me whether or not this order was served on Mr. Van Zandt?

[DETECTIVE KEYS]: It was.

[PROSECUTOR]: Okay. What went—what date was it? Excuse me.

[DETECTIVE KEYS]: The 17th of December of 2019.

[PROSECUTOR]: Okay. And how—how was it served on him? Does it say?

[DETECTIVE KEYS]: Ah, it says, "I served the respondent," and then lists Shawn Van Zandt's name and the address where it was served and what time.

[PROSECUTOR]: Okay. So personal service?

[DETECTIVE KEYS]: Yes, that would be my assumption.

RP (Aug. 25, 2020) at 169-70.

The trial court admitted the no-contact order as Exhibit 1. The exhibit listed Randee Van Zandt as the petitioner for the order.

Shawn Van Zandt testified on his own behalf. He presented more argument than percipient testimony. Van Zandt argued that the December 5 protection order never truly existed and resulted from a clerical error. RP (Aug. 25, 2020) 186-87.

On cross-examination, the prosecutor asked Shawn Van Zandt to examine the December 5 protection order. Van Zandt responded by asking:

7

[SHAWN VAN ZANDT]: What does this have to do with me? I—I've never seen this before in my life. I don't understand.

[PROSECUTOR]: So Mr.—

[SHAWN VAN ZANDT]: That's not what I was served with. I was—I was served with another copy of the same old cause number. I mean, the same old—the same old one that was taken care of. I just threw it in the garbage, the 19-2-0. This is—this is fictitious. This—this whole—this whole thing is.

RP (Aug. 25, 2020) at 194.

During closing, the prosecutor argued that Randee Van Zandt had called the police to report the presence of her son in her residence. Shawn Van Zandt interjected.

[PROSECUTOR]: . . . Mr. Van Zandt on February 29th entered Ms. Van Zandt's home. He may have used to live there, but he was no longer lawfully able to live there per the order of the court. He went in. *His mother called the police.* She met . . . Detective Keys at the door. She met him at the apartment. She let him in to where he found Mr. Van Zandt in the dwelling.

He knew there was an order. *And his mom obviously knew there was an order because she called the police.*

[SHAWN VAN ZANDT]: No, she didn't.

RP (Aug. 25, 2020) at 216-17 (emphases added). The State's attorney also commented during summation:

We heard testimony that *she had to come to court in order to get a protection order,* an order of protection, that's what happened here, against her son, Mr. Shawn Van Zandt, and that order was granted on December 5th and that it was served on him on December 17th.

RP (Aug. 25, 2020) at 210 (emphasis added).

In closing, Shawn Van Zandt commented on his mother's absence from trial:

8

And as far as everything else goes, why wouldn't my mom show up today? I mean, *if she wants me in trouble, she would have showed up.* I mean, she knows that there was—it was already handled. She didn't call the police. We—we had people removed from our house, and they were just running—

[PROSECUTOR]: Objection.

THE COURT: Okay, sustained.

[SHAWN VAN ZANDT]: Okay.

Well, she didn't show up in court today because it's a bunch of malarkey. This has already been handled. Like I said, the cause number and the date go to October 5th. It's on record. There was no—there was no rebuttal. The signature there on that fictitious NCO [no-contact order], it's not my mom's signature.

RP (Aug. 25, 2020) at 220-21 (emphasis added). To repeat, during colloquy before trial, Van Zandt had declared that his mother lacked competency to testify.

The jury returned guilty verdicts on violation of the protective order and burglary. The trial court imposed a prison-based Drug Offender Sentencing Alternative (DOSA) sentence. The court sentenced Shawn Van Zandt to thirty months' confinement and thirty months' community custody on the charge of violating a domestic violence no-contact order and 36.75 months' confinement and 36.75 months' community custody on the burglary charge.

The sentencing court found Shawn Van Zandt indigent for purposes of appeal. Under "community custody conditions," the court ordered Van Zandt to "pay the statutory rate to DOC [Department of Corrections], while on community custody, to offset the cost of urinalysis." Clerk's Papers (CP) at 68. Regarding fees and costs, the

sentencing court commented: "There's a $500 Victim Assessment. I'll waive everything else. $5 a month." RP (Sept. 29, 2020) at 254.

LAW AND ANALYSIS

Sufficiency of Evidence - Violation of Protection Order

On appeal, Shawn Van Zandt contends the State deprived him of due process by convicting him of a felony violation of a no-contact order without evidence. When reviewing a challenge to the sufficiency of the evidence, we view the evidence in the light most favorable to the State. We ask whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *State v. Hosier*, 157 Wn.2d 1, 8, 133 P.3d 936 (2006). A claim of insufficiency admits the truth of the State's evidence and all inferences that reasonably can be drawn therefrom. *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992). Circumstantial evidence and direct evidence carry equal weight on review. *State v. Goodman*, 150 Wn.2d 774, 781, 83 P.3d 410 (2004). This court defers to the jury's decision and does not consider questions of credibility, persuasiveness, and conflicting testimony. *State v. Davis*, 182 Wn.2d 222, 227, 340 P.3d 820 (2014).

The trial court instructed the jury that, for the State to convict Shawn Van Zandt of violation of a protective order, the State needed to prove:

> 1) That on or about February 29, 2020 there existed a protection order applicable to [Shawn Van Zandt];
> 2) That [Shawn Van Zandt] knew of the existence of the order;

10

3) That on or about said date, [Shawn Van Zandt] knowingly violated a provision of the order;
4) That [Shawn Van Zandt] had twice been previously convicted for violating the provisions of a court order; and
5) That [Shawn Van Zandt's] acts occurred in the State of Washington.

CP at 44; *see also* 11 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS CRIMINAL 36.51.02, at 714 (5th ed. 2021). Van Zandt disputes that the evidence sufficiently demonstrated elements two and three of the instruction— his knowledge of the order and knowing violation of a provision of the order.

RCW 9A.08.010(1)(b) defines "knowledge:"

KNOWLEDGE. A person knows or acts knowingly or with knowledge when:
(i) He or she is aware of a fact, facts, or circumstances or result described by a statute defining an offense; or
(ii) He or she has information which would lead a reasonable person in the same situation to believe that facts exist which facts are described by a statute defining an offense.

Despite the constructive definition of "knowledge" under RCW 9A.08.010(1)(b)(ii), Washington case law requires the State to prove a subjective standard of "knowledge" in order to convict the accused of most crimes. *State v. Allen*, 182 Wn.2d 364, 374, 341 P.3d 268 (2015); *State v. Shipp*, 93 Wn.2d 510, 517, 610 P.2d 1322 (1980); *State v. Jones*, 13 Wn. App. 2d 386, 404, 463 P.3d 738 (2020).

Shawn Van Zandt underscores that the December 5 protection order lacks his signature to prove he received a copy of the order. Van Zandt highlights *State v. France*,

11

129 Wn. App. 907, 911, 120 P.3d 654 (2005), wherein this court held that a certified copy of a no-contact order with the defendant's signature suffices to prove the accused's knowledge of the order. Van Zandt argues that the testimony of Detective Michael Keys supplied no proof because Keys never served Van Zandt. Instead, Keys referenced his belief of service as an "assumption." RP (Aug. 25, 2020) at 170.

The State responds that the jury could consider the admitted return of service as evidence for any purpose. The return demonstrates that a law enforcement officer served Shawn Van Zandt on December 17, 2019. The State highlights Van Zandt's testimony, when asked by the prosecutor to examine the December 5 protection order at trial.

We conclude that the State submitted sufficient evidence to convict Shawn Van Zandt of violation of a protective order. The jury reviewed the return of service and heard Shawn Van Zandt's testimony of being served a document with the same cause number, which document he claimed to have discarded immediately. The jury could have reasonably decided, based on this evidence, that Van Zandt possessed knowledge of the contents of the protection order.

*State v. France*, 129 Wn. App. 907 (2005) held that a certified copy of the no-contact order signed by the accused suffices to show knowledge by the defendant. Nevertheless, *State v. France* does not preclude other methods of proof.

Sufficiency of Evidence - Burglary

Shawn Van Zandt also argues that the State produced insufficient evidence to establish his conviction for burglary.

A burglary conviction requires the State to prove that a defendant entered or remained unlawfully in a dwelling with intent to commit a crime against a person or property therein. RCW 9A.52.025(1). This court has found that violation of a protection order may constitute the underlying crime predicating a burglary conviction. *State v. Sanchez*, 166 Wn. App. 304, 308, 271 P.3d 264 (2012); *State v. Spencer*, 128 Wn. App. 132, 139-41, 114 P.3d 1222 (2005); *State v. Stinton*, 121 Wn. App. 569, 576, 89 P.3d 717 (2004). Shawn Van Zandt does not ask us to abandon this precedent.

Shawn Van Zandt contends the State presented insufficient evidence to show he entered his mother's home with intent to commit a crime. Washington law defines intent:

> INTENT. A person acts with intent or intentionally when he or she acts with the objective or purpose to accomplish a result which constitutes a crime.

RCW 9A.08.010(1)(a).

The State presented testimony that Shawn Van Zandt knew of the order precluding him from entering his mother's dwelling. The State also supplied testimony that Shawn Van Zandt expressed no surprise when Detective Michael Keys found him inside his mother's dwelling. Thus, the jury heard sufficient evidence to convict Van Zandt of the intent to violate an order by entering his mother's residence.

13

Prosecutorial Misconduct

*Voir Dire*

Shawn Van Zandt argues that the prosecutor's statements and questioning, during voir dire, of the jury panel regarding Randee Van Zandt's failure to testify and the State's attorney's comment during closing that Randee called law enforcement constituted prosecutorial misconduct. We first address the voir dire questioning. In doing so, we outline principles of prosecutorial misconduct and then rules regarding voir dire.

To establish prosecutorial misconduct, a defendant must show that the prosecuting attorney's remarks were both improper and prejudicial. *State v. Allen*, 182 Wn.2d 364, 373 (2015). The burden to establish prejudice requires a defendant to prove a substantial likelihood that the instances of misconduct affected the jury's verdict. *State v. Thorgerson*, 172 Wn.2d 438, 442-43, 258 P.3d 43 (2011).

Shawn Van Zandt failed to object to the prosecuting attorney's questioning during voir dire. When a defendant fails to object to improper remarks at trial, the defendant waives review of the error unless the remarks were so flagrant and ill intentioned that they caused an enduring and resulting prejudice that could not have been neutralized by an admonition to the jury. *State v. Slater*, 197 Wn.2d 660, 681, 486 P.3d 873 (2021). A pro se defendant is not entitled to special consideration and the inadequacy of a pro se defense cannot provide a basis for a new trial or an appeal. *State v. DeWeese*, 117 Wn.2d 369, 379, 816 P.2d 1 (1991). The "flagrant and ill intentioned" standard sets a much

14

higher bar for reversal than the "improper and prejudicial" standard and applies only in a narrow set of cases when the court holds concern about the jury drawing improper inferences from the evidence. *State v. Loughbom*, 196 Wn.2d 64, 74, 470 P.3d 499 (2020). Under this heightened standard, the defendant must show (1) no curative instruction would have obviated any prejudicial effect on the jury and (2) there is a substantial likelihood that the misconduct affected the jury's verdict. *State v. Emery*, 174 Wn.2d 741, 761, 278 P.3d 653 (2012).

CrR 6.4(b) governs voir dire in criminal cases:

> A voir dire examination shall be conducted for the purpose of discovering any basis for challenge for cause and for the purpose of gaining knowledge to enable an intelligent exercise of peremptory challenges. The judge shall initiate the voir dire examination by identifying the parties and their respective counsel and by briefly outlining the nature of the case. The judge and counsel may then ask the prospective jurors questions touching their qualifications to serve as jurors in the case, subject to the supervision of the court as appropriate to the facts of the case.

The purpose of voir dire

> is to enable the parties to learn the state of mind of the prospective jurors so that they can know whether or not any of them may be subject to a challenge for cause, and determine the advisability of interposing their peremptory challenges.

*State v. Frederiksen*, 40 Wn. App. 749, 752, 700 P.2d 369 (1985) (quoting *State v. Laureano*, 101 Wn.2d 745, 758, 682 P.2d 889 (1984).

> [I]t is not a function of the voir dire examination to educate the jury panel to the particular facts of the case, to compel the jurors to commit themselves to vote a particular way, to prejudice the jury for or against a

> particular party, to argue the case, to indoctrinate the jury, or to instruct the jury in matters of law.

*State v. Frederiksen*, 40 Wn. App. at 752 (internal quotation marks, and alterations omitted) (quoting *People v. Williams*, 29 Cal. 3d 392, 628 P.2d 869 (1981).

In Shawn Van Zandt's prosecution, the prosecutor's statements in voir dire may have gone beyond the proper purposes of juror examination. Rather than only asking the jury its thoughts about a hypothetical victim failing to testify at trial, the State announced to the venire that victim Randee Van Zandt would not testify before them. Thus, the prosecutor submitted facts of the case to the jury. The State's attorney then posed the question about why any domestic violence victim, not Randee, may not appear to testify. But the prosecuting attorney had already mentioned Randee's prospective absence from trial and impliedly asked potential jurors to draw conclusions regarding Randee's failure to testify. Those conclusions could include a fear to testify because of possible retaliation by Shawn Van Zandt. Also, the prosecuting attorney never informed the jury, during questioning, of the State's right to subpoena the witness or obtain a material witness bench warrant.

We do not decide whether the prosecutor engaged in an improper voir dire, because we may rest our decision on another ground. We conclude that any mistake was not ill-intentioned. Shawn Van Zandt cites no case in which the court ruled that questioning the venire about the victim failing to appear constituted misconduct. More

16

importantly, the State's attorney announced to the trial court and Van Zandt, before voir dire, that he intended to question the jury about the victim's failure to appear at trial. Van Zandt never objected.

*Closing Argument*

Shawn Van Zandt next assigns error to the prosecutor's argument during closing that Randee Van Zandt had called law enforcement about him. No evidence at trial established this fact. Van Zandt also complains that the prosecuting attorney commented that Randee needed to obtain a protection order when no one testified to this fact. The State responds that inferences from the evidence support both of the prosecuting attorney's comments. The State highlights that Exhibit 1 showed Randee to be the no-contact order petitioner.

In response to the prosecutor's assertion that Randee Van Zandt had called police, Shawn Van Zandt interjected, "No, she didn't." RP (Aug. 25, 2020) at 217. In a footnote, the State argues that Van Zandt's interjection did not constitute an objection. Br. of Resp't 29 n.8. Argument raised in a footnote need not be considered by this court. *State v. Johnson*, 69 Wn. App. 189, 194 n.4, 847 P.2d 960 (1993). We proceed as if Van Zandt properly objected to the State attorney's comments. Therefore, the lower "improper and prejudicial" standard applies.

In closing argument, counsel is given wide latitude to argue the facts in evidence and reasonable inferences. *State v. Smith*, 104 Wn.2d 497, 510, 707 P.2d 1306 (1985).

17

Nevertheless, counsel may not make prejudicial statements not sustained by the record. *State v. Dhaliwai*, 150 Wn.2d 559, 577, 79 P.3d 432 (2003).

We agree with the State that strong inferences from the evidence showed that Randee Van Zandt sought the protection order. The order, admitted as an exhibit, established her to be the petitioner.

We agree with Shawn Van Zandt that no direct testimony established that his mother telephoned the police for assistance on leap day. We do not resolve whether inferences from the State's evidence supported the prosecuting attorney's suggestion of this fact during closing, because we find no prejudice.

The guilt of Shawn Van Zandt did not depend on the identity of the caller to law enforcement. Overwhelming evidence established that Van Zandt received a copy of the protection order and that he entered his mother's home in violation of the order. In addition to the return of service, Van Zandt testified he received a copy of an order with the same cause number. Van Zandt did not act surprised when arrested inside the home.

*Cumulative Prejudice*

Even when discrete instances of misconduct do not separately justify a new trial, repetitive misconduct can have a "'cumulative effect.'" *State v. Loughbom*, 196 Wn.2d 64, 77 (2020). We question whether the prosecutor committed any misconduct. Regardless, as already written, overwhelming evidence supported Shawn Van Zandt's convictions such that any misconduct did not cause prejudice.

Community Custody Urinalysis Fees

Shawn Van Zandt argues that the sentencing court imposed a discretionary community custody fee without conducting an inquiry into his indigent status. Thus, he asks that, in the event this court affirms his convictions, we strike the part of the judgment and sentence that orders him to pay community custody urinalysis fees. The State acknowledges that the sentencing court did not specifically state whether it intended to impose the fees. The State asks that this court remand for clarification as to the sentencing court's intent.

Despite Shawn Van Zandt's argument to the contrary, the sentencing court inquired about his financial capability and entered a finding of indigence. The court also waived all costs other than the mandatory $500 victim impact assessment. The imposition of the community custody supervision fee may have been a clerical error.

A sentencing court may waive an offender's requirement to pay supervision fees during a term of community custody. RCW 9.94A.703(2)(d). The Washington Supreme Court recently held that the imposition of a discretionary supervision fee that a trial court had orally waived during the sentencing hearing should be stricken from the final judgment and sentence. *State v. Bowman*, __ Wn.2d __, 498 P.3d 478, 489-90 (2021). The Court cited with approval a case in which Division I of this court reached the same conclusion, *State v. Dillon*, 12 Wn. App. 2d 133, 152-53, 456 P.3d 1199, *review denied*, 195 Wn.2d 1022, 464 P.3d 198 (2020). In accordance with the Supreme Court's holding

No. 37788-1-III
*State v. Van Zandt*

in *Bowman*, we remand for the purpose of striking the discretionary community custody urinalysis fee.

CONCLUSION

We affirm Shawn Van Zandt's convictions for burglary and violation of a protection order. We remand to the sentencing court for the purpose of striking the fee imposed for urinalysis during community custody.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Fearing, J.

WE CONCUR:

_____
Siddoway, J.

_____
Pennell, C.J.

20